Joaquim Magalhaes **MARTINS FERREIRA** et al., individually and trading as Martins Ferreira and Irmaos, Plaintiffs,

v.

**JAYESS CORPORATION,** Sepenuk & Sons Corp., Alexander Marques and Mack Sepenuk, Defendants.

Civ. A. No. 978–60.

United States District Court
D. New Jersey.
Feb. 18, 1964.

261 F.2d 517; Folsom v. Pearsall, 9 Cir., 1957, 245 F.2d 562.

434

Meyer Linnick, Newark, N. J., and Jerome Teich, New York City, for plaintiffs.

Aaron Marder, Newark, N. J., for Jayess Corp., Sepenuk & Sons Corp. and Mack Sepenuk.

Checki & Politan, by Nicholas H. Politan, Lyndhurst, N. J., for defendant Marques.

WORTENDYKE, District Judge:

The complaint in this action has been dismissed as to all the defendants. See this Court's orders of December 11, 1961 and March 15, 1963, and the opinion filed February 28, 1963 (reported at 214 F. Supp. 723).[1] The adjudication expressed

---

1. Since that opinion was filed, plaintiffs have instituted in the Law Division of the Superior Court of New Jersey, a new action against Marques, upon the agreement of sale of May 17, 1957 referred to in the complaint in the present action. Marques, in the State action, has joined Jayess (the Jayess defendants here) as third-party defendants, upon a complaint for indemnification, for the amount of Marques' profit, for one-half of his expenses in traveling to Portugal, for loss of profit on additional sales which Marques claims he could have made to plain-

in the opinion was (by agreement of the parties and with the consent of the Court) limited to the issue of the liability of the defendants Jayess Corporation, Sepenuk & Sons Corp. and Mack Sepenuk (jointly hereinafter referred to as Jayess) to the plaintiffs (hereinafter Ferreira). The dismissal of the complaint on motion, as to defendant Alexander Marques (hereinafter Marques), was for lack of jurisdiction over the cause of action therein alleged against him. He remains in the case as a cross-claimant against Jayess, and as a respondent to counter-claim of Jayess against him. The counterclaim of Jayess for abuse of process against both Ferreira and Marques was dismissed by this Court's order of June 14, 1963. Thus there remain in the action pending in this Court only two claims: (1) the crossclaim of Marques against Jayess, and (2) the counter-claim of Jayess against Marques.

Ferreira, operators of a metals foundry in Braga, Portugal, sought damages from all of the defendants for alleged breach of contract for the sale of light copper scrap for which they paid $44,010. They claim that by reason of the inferior quality of the merchandise shipped to them, they were compelled to reduce their prices to customers to whom they were committed to sell the merchandise. Marques admits, but Jayess denies, the contract of sale upon which Ferreira bases its complaint.

In its counterclaim against Ferreira and Marques, Jayess alleges that, on May 17, 1957, it agreed to sell to Marques 60 metric tons of light copper scrap for the price of 24¾¢ per pound, subject to the opening of an irrevocable letter of credit in the amount of the agreed price in favor of Jayess at the Chase National Bank of New York City. The counterclaim further alleges that, prior to June 10, 1957, Marques agreed to sell 60 metric tons of light copper to Ferreira, who caused their bank in Portugal to issue its assignable, irrevocable letter of credit, for $35,010 or more, in favor of Lusitania Export Agency (Marques' business name), which assigned the letter of credit to Jayess to the extent of $35,010, and that Jayess delivered to Marques 59.7905 metric tons of the merchandise, which was shipped to Ferreira. The counterclaim further alleges, and Marques admits, that, for purposes of collection, Jayess assigned the letter of credit to its nominee, who instituted an attachment action in New York whereby collection of the letter of credit in full was accomplished on September 3, 1957.

In his amended cross-claim against Jayess, Marques claims $2,000, representing the difference between the aggregate of the proceeds of two letters of credit assigned to Jayess ($44,000) and the sum of the price of seventy-five metric tons of light copper sold and delivered by Marques to Ferreira ($40,-000), and the freight charges assumed by Marques ($2,000). That difference, $2,000, is alleged to represent Marques' profit on the transaction. Marques also seeks to recover from Jayess $1,500 as one-half of Marques' expenses of his trip to Portugal in an effort to adjust the complaints of Ferreira respecting the quality of the merchandise received by them. In another count of his amended cross-claim Marques alleges that on May 16, 1957 he entered into a contract with Ferreira for sale to them of one thousand tons of copper, which he was to locate, at a price which would yield Marques a profit of 1.5¢ to 2¢ per pound; that the copper sold by Jayess to Marques was of inferior quality to that represented by Jayess, and that, in consequence of that misrepresentation by Jayess, Ferreira refused to perform their contract with Marques, and he was thus deprived of profits of $35,000.

In its answer to the amended cross-claim of Marques, Jayess admits that on May 16, 1957 it agreed to sell 75 tons of a certain grade of copper to Marques,

tiffs but for the unmerchantable quality of the scrap copper shipped by Jayess, and for loss of prospective business advantage alleged to have resulted from the same cause. The action referred to is awaiting trial in the State Court.

trading as Lusitania Export Agency, for delivery to Ferreira in Portugal, for 24¾¢ per pound, Marques to pay freight charges and all insurance on shipments made by him. Jayess further admits that Marques assigned to Jayess two letters of credit received by him from Ferreira as conditional payment by Marques to Jayess for the copper. The first letter of credit was for $9,000, plus 10% if drawn upon. The invoice of Jayess to Marques for delivery of some 15 tons of copper came to $8,206.82, which included $79.94 for insurance. Jayess claims it collected $9,079.44 (sic, should read $9,079.94) on the first letter of credit, and paid the difference of $873.12 to Marques. Against the second letter of credit for $35,010 plus 10% if drawn upon, which Marques assigned to Jayess, the latter claims it charged Marques for some 60 tons at 24¾¢ per pound, plus freight, insurance and telephone, a total of $35,615.07. Jayess further claims it collected only $34,575.90 on the second letter and seeks the difference between these two figures, plus the total due on an alleged loan to Marques of $600 and the legal expense ($1,573.90 of which amount the attorneys who sued to collect upon this letter of credit had deducted fees of $1,073.90 before remitting the $34,575.90 to Jayess, the remaining $500 of the total amount of the fee had been paid to them as a retainer) which Jayess incurred for collection of the second letter of credit. Upon these figures Jayess claims that Marques is indebted to Jayess for $3,213.07. Jayess denies any liability for any part of Marques' travel expenses or any misrepresentation to Marques and any liability for his lost profits of $35,000.

Appended to Jayess' answer to the amended cross-claim is an additional counterclaim against Marques demanding (1) the payment of the $3,213.07 deficiency due to Jayess and (2) lost profits of $1,091.31 caused by Marques' alleged breach of an agreement to purchase 33 tons of light copper scrap from Jayess in August of 1957. Marques denies the debt of $3,213.07 and the liability for lost profits.

At the pretrial conference, it was conceded by all of the parties to this action that Ferreira contracted with Marques for the purchase from Marques of 75 tons of "light copper" scrap at the price of $578.00 per ton for some of it and $600 per ton for the balance of the order; that "light copper" scrap was shipped to the plaintiffs; that the plaintiffs paid in full for the "light copper" scrap which they ordered; and that the moneys paid by the plaintiffs for that scrap were received by Jayess under an assignment or assignments of letters of credit from Marques to Jayess. The defense of the Statute of Frauds was raised by Marques in answer to Jayess' counterclaim and by Jayess to Marques' amended cross-claim, but the defense was abandoned by the respective parties at the trial.

The Jayess defendants contend, and I find factually, that Marques agreed to purchase from Jayess who agreed to sell to Marques, for export to Portugal, 60 tons of light copper at 24¾¢ per pound, as such product is defined in Standard Classification for Non-Ferrous Scrap Metals, Circular NF–50, effective April 1, 1950, which provides as follows:

"Dream 6—LIGHT COPPER

"May consist of the bottoms of kettles and boilers, bathtub linings, hair wire, burnt copper wire which is brittle, roofing copper and similar copper free from radiators, brass and bronze screening, excessive lead and solder, readily removable iron, old electrotype shells, unclean gaskets, and free of excessive paint, tar and scale."

That contract between Jayess and Marques is embodied in a letter dated May 17, 1957 from Jayess to Lusitania Export Agency (Marques). The merchandise was required to be suitably packed by the seller for export in bales and/or drums, F.A.S. Coast Ports, and if the freight rate were higher than from New York, the excess freight would be "for

the account of Jayess Corporation." Shipments were to be made during June and July 1957. Partial shipments were permitted in lots of not less than 15 tons. The order embodied in the letter from Jayess to Lusitania was accepted by Marques and by its terms was made subject to the opening by Marques of an irrevocable letter of credit suitable and acceptable to Jayess, and in its favor, on or about May 24, 1957, at the Chase National Bank in New York City. The letter further provided that the order contained therein was subject to the obtaining by Marques of the proper export license from the United States Department of Commerce. Payment to Jayess for the merchandise was to be made against its commercial invoice, weight certificates and dock receipts.[2] Jayess was a dealer in scrap metals, but had no scrap inventory when its agreement with Marques was entered into.

Pursuant to the agreement, Marques obtained the necessary export license and an assignable irrevocable letter of credit issued in favor of Marques with the Chase Manhattan Bank of the City of New York, in the sum of $9,000 covering 14,000 kilos of copper scrap at a price of $600.00. This letter of credit was assigned by Marques to Jayess under date of June 5, 1957. Jayess collected the proceeds thereof upon shipment via S. S. Ribiera Grande of 15 tons of what was represented to be light copper scrap. The date of that shipment was June 26, 1957. Out of the proceeds of the assigned letter of credit which were collected by Jayess, it paid to Marques the sum of $873.12 in three checks, all in evidence, in the following dates and amounts: June 13, 1957 $200.00; June 20, 1957 $200.00; and June 28, 1957 $473.12. The next shipment of copper scrap was via the S.S. Fortuna on July 31, 1957 consisting of 26.9145 metric tons, of which 15 metric tons were charged at $600.00 per ton and 11.9145 at $578.00 per ton. With insurance

amounting to $280.82, the total invoiced by Marques to Ferreira was $16,167.40. On August 8, 1957, a further shipment of copper scrap was made via S.S. Monte Brasil in the quantity of 32.8760 metric tons, invoiced at $578.00 per ton, totalling, with insurance of $336.37, the sum of $19,338.59. In accordance with his contract with Jayess, Marques obtained from his consignee in Portugal a further irrevocable assignable letter of credit in the amount of $35,010.00 which he assigned to Jayess. The proceeds of this letter of credit were ultimately collected by Jayess through the institution of attachment proceedings in New York.

After the first shipment had arrived in Portugal and while the second and third shipments were en route, Marques received a message from Ferreira, dated July 25, 1957, complaining that the quality of the shipment was not in accordance with the agreement. Marques advised Jayess of this complaint and of the request of the plaintiffs that further shipments be held up. Jayess informed Marques that the remaining shipments were either on the dock, or en route thereto, and assured him that everything would be taken care of. By this time, Jayess had become the irrevocable assignee of both letters of credit which, as previously stated, aggregated $44,010.00.

It was the testimony of Marques that he went to Portugal on August 23 or 24, 1957, for the purpose of endeavoring to adjust the complaint of the plaintiffs respecting the quality of the scrap which had been shipped, and that in doing so he incurred expense approximating $3,000 for his fare and other expenses covering his stay in Portugal for approximately two and a half months. Marques testified that Sepenuk, the president of Jayess, told him that he would help with Marques' expense in connection with the trip to Portugal. Sepenuk emphatically denies that he made any such offer; and also testified

2. The same agreement provided also for the sale by Jayess to Marques of 50 metric tons of Yellow Brass Scrap at 19½¢ per pound, but the brass was never shipped, nor is any claim made with respect thereto in this case.

438

that Marques never requested him to make any contribution toward his expenses for the trip. I find that there was no agreement between Marques and Jayess for reimbursement of or contribution to åny part of Marques' expenses for his trip to Portugal, and therefore, Count II of Marques' amended cross-claim should be dismissed. (Count III of the amended cross-claim which sought the same recovery as Count II, was withdrawn at the pretrial conference.)

It is the contention of Marques that he had purchased from Jayess and sold to the plaintiffs for $44,010.00, 75 tons of light copper scrap upon the shipment of which the freight charge of $2,062.50 was payable by Marques and deductible from his price to the plaintiffs. He claims that he purchased the 75 metric tons at 24¾¢ per pound from Jayess, and that his profit amounted to $1,035.00.

Marques alleges and Jayess admits that on or about May 16, 1957, Jayess agreed to sell 75 metric tons of a certain grade of copper to Marques, trading as Lusitania Export Agency, for delivery to Martins Ferreira in Portugal at a cost of approximately $40,000; and that the freight charges upon the shipments thereof amounted to approximately $2,-000. The evidence discloses, and I find, that payment of insurance and freight charges for shipments of the copper to Portugal had become the obligation of Marques under his agreement with Martins Ferreira. Both of these parties concede that two letters of credit in amounts aggregating $44,010 and payable to Marques were assigned by him to Jayess, which collected the proceeds thereof. Marques claims to be entitled to the difference between the avails of these letters of credit, less the freight charges and the cost of the copper, as his profit. Marques admits that he purchased the 75 tons of copper from Jayess for 24¾¢ per pound and sold it to Martins Ferreira for 27¢ per pound, including freight. He charges Jayess with having collected $44,010 on the letters of credit, charges himself with freight of $2,062.-50, and claims as his profit the balance,

$41,947.50, less Jayess' price to him for the copper. At 24¾¢ per pound, Marques testified that 75 metric tons of the copper cost him $40,912.50. Therefore, Marques says that he should recover $1,-035.00 from Jayess upon the over-all transactions.

As Jayess correctly states, the first of the two letters of credit was for $9,000. under which the first 15 tons of copper were shipped to Portugal. For these 15 tons, Marques became indebted to Jayess in the amount of $8,206.82, including $79.94 for insurance. Jayess collected $9,079.94 on the first letter of credit and paid the entire difference of $873.12 to Marques; this Marques admits.

■■ The second letter of credit for $35,010 related to the remaining 60 tons. At 24¾¢ per pound, Jayess claims Marques would owe it $32,624.45. Jayess collected, on the second letter of credit, a gross amount of $35,649.80; since Jayess was owed only $32,624.45 for the 60 tons, Marques was entitled to the balance of $3,025.35. But Jayess had expended, in connection with the 60 ton shipment, the following sums: (1) $2,-958.08 for freight and insurance, which were Marques' obligations; (2) the $600 advance to Marques; (3) $32.54 for telephone calls; and (4) $1,573.89 in attorneys' fees for collecting the gross amount of the second letter of credit. These expenses total $5,164.51, and after crediting Marques with the $3,025.35 due him, there is a balance due Jayess from Marques of $2,139.16 (this is the amount claimed by Jayess at the pretrial conference on Count I of its counterclaim against Marques, thereby modifying the demand in the counterclaim for $3,213.-07). With regard to the attorneys' fee for the collection of the second letter of credit, there is nothing in the record to support Jayess' claim for this expenditure from Marques because there is no evidence that he made the use of the attorneys necessary. Nevertheless, Marques did owe Jayess the $600 for advances made on any profit Marques might derive (see exhibits DJ–10A, B and C of June 16, 1961). The freight,

insurance and telephone charges were also Marques' obligation, for which Jayess should be reimbursed. Consequently, Marques made no profit on the 60 ton transaction, and has become indebted to Jayess for a net amount of $565.27 (Jayess' total expenses of $3,-590.62 excluding the attorneys' fee, less the credit of $3,025.35 due to Marques). Consequently, Count I of Marques' amended cross-claim for any balance due him from Jayess on the sale of the 75 tons to Ferreira must be dismissed, and judgment should be entered in favor of Jayess on Count I of its counterclaim, for $565.27.

■ Marques' amended cross-claim in Counts IV and V, alleges that he had a contract with Ferreira for 1,000 tons of copper and that Jayess' alleged misrepresentations as to the quality of the first 75 tons caused Ferreira to refuse to continue performance of the alleged contract, thus resulting in a loss to Marques of profits of $35,000 on the contract. The evidence before me shows that, although Ferreira and Marques talked of purchases in addition to the 75 tons actually shipped by Jayess to Ferreira, there was never any firm agreement between Marques and Ferreira, nor between Marques and Jayess, for the sale of any metal products other than the 75 tons of copper received by Ferreira. It follows that there was no contract for 1,000 tons of copper between Marques and Ferreira which could have been interfered with by Jayess, and Counts IV and V of Marques' amended cross-claim will be dismissed.

■ Jayess also counterclaims against Marques for $1,091.31 alleged to represent the amount of profits which Jayess lost by reason of failure of Marques to perform his agreement of August 8, 1957 to purchase from Jayess an additional 33 metric tons of light copper scrap at 23½¢ per pound.[3] In his letter

to Jayess of the stated date, Marques purports to confirm purchase of the material from Jayess at the stated price and advises Jayess that Marques holds Manufacturers' Trust Company letter of credit #373194 for $19,800 which he pledges to Jayess "to cover payment against the sale." In that letter Marques requested delivery before September 23, 1957. Manufacturers Trust Company had written Marques on July 25 and 29 respectively requesting permission to cancel the letter of credit or to agree to its amendment requiring "official superintendence certificate stating closely [sic] goods have been examined bundle per bundle as being clean copper scrap." On August 8, 1957, Manufacturers wrote a further letter to Marques requesting reply to its previous letters. By its letter of September 3, 1957, Jayess advised Marques, with reference to the latter's "proposed" purchase mentioned in his letter of August 8, 1957, that it would only sell merchandise to Marques against an irrevocable letter of credit naming Jayess as beneficiary or duly assigned to it. In the same letter, Jayess rejected Marques' tendered pledge of the letter of credit "notwithstanding the fact that the market value of Light Copper Scrap is now substantially less than 23½¢ per lb. * * * [We] have now decided that we will sell to you only upon a confirmed, irrevocable Letter of Credit opened with a New York City Bank acceptable to us, which Letter of Credit must name us as beneficiary." I find as a fact that no enforcible contract existed between Marques and Jayess with respect to the 33 metric tons of light copper scrap referred to in Count II of the Jayess' counterclaim against Marques; therefore, Marques should have judgment of dismissal of that Count.

In summary, all the counts of Marques' amended cross-claim are hereby dismissed. Count II of Jayess' counter-

---

3. Sepenuk testified on deposition that at the time the contract of sale was cancelled, he lost, by reason of a precipitate reduction in the market price, 4¢ a pound, or approximately $3,000, for which he sought reimbursement. (The amount specified in Jayess' cross-claim is $1,091.-31 on this account.)

claim is also hereby dismissed, but judgment should be entered in favor of Jayess against Marques for $565.27 on Count I of its counterclaim.

The foregoing opinion shall constitute my findings of fact and conclusions of law. Let an order be entered in conformity with the views therein expressed.