FRANCISCO CINTRONE, PLAINTIFF-APPELLANT, v. HERTZ TRUCK LEASING & RENTAL SERVICE, DEFENDANT-RESPONDENT.

Argued March 15 and 16, 1965—Decided August 4, 1965.

436

Mr. *Bernard Chazen* argued the cause for plaintiff-appellant (*Messrs. Baker, Garber & Chazen,* attorneys).

Mr. *Sanford E. Chernin* argued the cause for defendant-respondent (*Messrs. Krowen, D'Amico & Chernin,* attorneys).

Mr. *Samuel H. Nelson* filed a brief on behalf of Avis Rent A Car System, Inc., *amicus curiae.*

*Messrs. Sidney M. Schreiber, Roger F. Lancaster* and *Gerald W. Conway* filed a brief on behalf of Ava Truck Leasing, Inc., *amicus curiae* (*Messrs. Schreiber, Lancaster & Demos,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff Francisco Cintrone was injured while a passenger in a truck leased by his employer from the defendant. In his complaint in this action he charged that the accident in which he was injured resulted from defendant's negligent inspection or maintenance of the leased vehicle or from a breach of defendant's warranty that the vehicle was fit and safe for use. (Whether the alleged warranty was express or implied was not specified.) The trial court dismissed the warranty claim, and submitted the issues of defendant's negligence and plaintiff's contributory negligence to the jury, which found in favor of the defendant. Plaintiff's appeal from the adverse judgment was certified on our own motion before the Appellate Division acted upon it.

Plaintiff presents two grounds of appeal: the trial court erred (1) in dismissing the warranty count of the complaint and in refusing to submit that issue to the jury, and (2) in allowing the jury to consider the defense of contributory negligence. Study of the record has led us to the conclusion the judgment should be reversed because, on the facts proved, the contract for the leasing and use of the truck gave rise to an implied warranty that it was fit for the use contemplated by plaintiff's employer. Furthermore we hold that the evidence adduced with respect to the circumstances surrounding the happening of the accident created a jury question as to whether a breach of the warranty had been shown and whether if shown, it was the producing cause of the accident. In our judgment, however, it was not error to submit the issue of plaintiff's contributory negligence to the jury.

■ It has been suggested that the warranty or strict liability problem should not be considered by this Court because the issue was not raised seriously in the trial court. The record is to the contrary. The second count of the complaint is clearly grounded on breach of warranty that the "vehicle was fit and safe for use." Moreover, the pretrial order specifically contains the contention that defendant "in supplying said truck to plaintiff's employer warranted that it was fit for the pur-

pose for which it was being used * * *." The quoted allegation continued *"and* by the contract of rental undertook to keep said vehicle in good order and repair and that said defendant breached said warranty because it was unsafe and unfit for use because of the faulty brake system of which the defendant knew or should have known." (Emphasis added) Although the language may not be crystal clear, it cannot be concluded as a matter of law that the alleged warranty was expressly tied or limited to a claim of breach of defendant's undertaking to keep the vehicle in good order and repair. In setting forth its contentions defendant twice denied breach of warranty, and, in addition, asserted that if the warranty theory did apply, "it did not run in plaintiff's favor or behalf." The section of the pretrial order reciting the issues to be tried specified, among other things: "Was there a breach of warranty by defendant?"

At the close of the case, but before summations, the trial judge expressly dealt with the warranty issue. He said:

"Gentlemen, I still have under reservation a motion addressed to the dismissal of the second count with reference to warranty."

Then he advised counsel of his intention to limit his charge to the jury to the question of negligence. Plaintiff's attorney duly noted an objection. Thus the matter of warranty was clearly in the case and is justifiably presented to this Court for determination.

■■ The intimation is made also that the warranty or strict liability issue should not be decided by us because (1) the case is a trivial one as to plaintiff's injury and monetary losses, (2) the presentation at the trial level was superficial on both sides, and (3) the evidence was sparse upon which to consider and determine an important legal principle. As we have said, the warranty question is raised properly on the record before us. Once that fact appears, a litigant is entitled to have his day in court. If the evidence adduced here created a factual issue as to whether a warranty of fitness which

extends to him was breached, or if the evidence created a factual issue as to whether defendant violated a duty which gives a cause of action based on strict liability in tort, it is the obligation of the judiciary to provide appropriate redress. Our duty to hear and decide an appeal does not depend on whether the *quantum* of damages suffered was great or little. (It may be noted that the case was not transferred to the district court. See *R. R.* 4:3–4.) Nor is it an appellate court function to weigh evidence. If the proof established a factual issue as to whether plaintiff's right was violated, we cannot refuse to hear him because we have doubts as to his credibility, or even if we think a jury would probably decide against him.

Defendant Hertz Truck Leasing & Rental Service is in the business of leasing and renting various types of motor vehicles to the public. Plaintiff's employer, Contract Packers, Inc., had leased nine trucks from defendant for use in its business. One of them was a 1959 Ford, 22 feet long and 11 feet high. The leasing of the trucks was on a long-term basis. Neither party put the lease in evidence but oral testimony was introduced as to its terms.

Contract Packers' place of business is on Warren Street, Jersey City, New Jersey. Hertz' garage and place of service of the trucks leased to Contract Packers is at 15th and Provost Streets in the same city. Under the lease the trucks were kept at Contract Packers' premises but Hertz agreed to service, repair and maintain them. The arrangement was that once a year or every 18,000 miles, whichever came first, Hertz was to provide "preventive maintenance." This meant that the vehicle was taken from the lessee (who was given a replacement) and brought to Hertz' garage. There the entire vehicle was examined and serviced; body, motor, brakes, springs, steering mechanism, lights, etc., after which it was returned to the lessee. In addition, every 14 days a Hertz mechanic was sent to Contract Packers' premises to inspect the trucks. He would go over them, checking the brake pedal reserve, the clutch, hand brake, lights, horn, steering and signal lights, etc. If repairs or adjustments were needed and could be made on the

spot, they were taken care of immediately. If not, the truck would be removed to the Hertz garage and if necessary a replacement vehicle provided.

Moreover, under the arrangement between the parties, at the end of each day's use the Contract Packers driver who had driven one of the trucks that day brought it to the Hertz garage where it would be "gassed up" for the next day. While this was being done, the procedure was for each driver to report any trouble he had or complaint he wished to make in connection with the operation of his truck. He would fill out an A.V.D. (alleged vehicle defect) form specifying the problem. If a complaint related to some minor difficulty that could be corrected quickly, it would be taken care of immediately and after the gassing operation was completed, the driver would be allowed to drive the vehicle back to his employer's place of business. (The impression gained from the record is that Contract Packers loaded the trucks during the night so as to have them ready to start on the delivery route in the morning.) If the difficulty required more attention but still was of a minor nature, the driver would be allowed to drive it back to his employer's yard. Then when Hertz' night shift mechanics came on duty (the garage operated 24 hours a day, seven days a week), they would pick up the truck, drive it to the garage, make the repairs or adjustments and return it to Contract Packers so as to have it available for morning use. There is some indication in the evidence that a simple repair or adjustment might be taken care of at the lessee's location without removal to the Hertz garage.

Whenever a needed repair which a driver had brought to Hertz' attention could not be made during gassing up, or on the lessee's lot at night, the truck would be removed from service and replaced by another. Then on completion of the work, the vehicle would be returned to the lessee and the substitute recalled. If a complaint related to allegedly defective brakes, the truck would be replaced. In such a situation the brake pedal reserve would be checked, and the master cylinder examined for fluid level. Thereafter the truck would be tried

out in the yard, and taken out on the road for a testing of the brakes at higher speeds. Following the remedial operation, the vehicle would be returned to the lessee.

The plaintiff Cintrone had been in the employ of Contract Packers as a driver-helper for three years before the accident in question which occurred on Monday, April 3, 1961. On Wednesday, Thursday and Friday of the previous week he had driven the leased 1959 Ford truck described above. He testified that at the end of the run on each of those days he reported the brakes were not working and needed adjustment. The three complaints were made at the Hertz garage while refueling by filling out two A.V.D. slips each day. One remained with Hertz, the other went to his employer. Hertz apparently had no record of the three slips allegedly left with it by Cintrone. Nor did plaintiff produce at the trial the copies which he said went to his employer. In any event, so far as Cintrone knew no repairs or adjustments were made to the brakes. The truck may have been used the next day, Saturday, but if so, it was driven by someone else. On two of the three days Cintrone referred to he had a helper with him. He said the helper left the employment shortly thereafter, but he made no effort to locate him for use as a witness at the trial.

On April 3, 1961 the Ford truck was scheduled for a delivery trip. Cintrone was to be the helper that day and one Robert Sottilare, another Contract Packers employee, the driver. The men reported for work at about 7:00 A.M. At the trial Sottilare testified that before they left the employer's lot Cintrone spoke to him about the brakes. Cintrone made no mention of this in his testimony. Sottilare said he tested the brakes before driving away and they seemed to be all right.

Sottilare drove from Jersey City to Dover, New Jersey where they had the first delivery. On the way the truck had to be stopped at red lights and sometimes in traffic. Cintrone testified he did not know whether this occurred once or twenty or fifty times. But he did not say he noticed anything unusual about the brakes or that they were not functioning. Sottilare testified that up until the time of the accident he had

no difficulty with the brakes; they were in operating condition; they did not fail in any way; "they wasn't perfect"; "they were a little low but they held."

After leaving Dover the men headed for Suffern, New York. About noontime, as Sottilare was going along Route 202, apparently within the limits of Suffern, he came around a bend in the road and saw an overhead bridge or trestle a hundred feet or so ahead of him. It was a low bridge, the clearance only 9 feet, 6 inches. Sottilare applied his brakes; they failed. The truck "just kept going" forward until the peak of its body hit the overhead structure. As Cintrone put it, he saw "the driver pumping the brakes. And he never stopped the truck because the brakes didn't work."

Both men were injured. They were removed to a hospital in Suffern, Sottilare by ambulance, Cintrone by police car. Cintrone was examined, given some pills and released; Sottilare remained there.

Cintrone drove the truck back to Contract Packers in Jersey City. He said he drove slowly, in first or second gear, using the hand brake and the low gear for slowing and stopping. On arrival in Jersey City he did not drive the truck to the Hertz garage and report the accident or any trouble with the brakes. He left the vehicle at his employer's lot. In fact, when testifying, he did not say he reported the accident to Contract Packers. The record is barren of any statement by him that he ever told Hertz or his employer about the accident or its details.

Sottilare signed a report of the accident on the evening of April 3. In it he said: "My truck hit a low railroad bridge." There was no note about the alleged failure of the brakes. He testified, however, that he told the person to whom he gave the report about the failure of the brakes.

The record is silent as to when the truck was used next after the accident. On April 11, eight days after the accident, presumably at the end of the day, the truck came to Hertz' garage. The testimony does not show who drove it there. An

A.V.D. form was made out to record a complaint that the brakes were faulty. The night foreman noticed that the "peak" of the truck body was damaged. At one point in his testimony he said he and one of the mechanics inspected and tested the brakes and found nothing wrong. The form dated April 11 and entitled "Foreman's Investigation of A.V.D." was produced at the trial. It contained a notation: "Brakes checked. Found to be in working order." The next two lines on the form after that comment were:

"Is A.V.D. confirmed: No: If yes, probable cause: None."

The night foreman's signature and date and time appear at the bottom. The time noted was 7:00 P.M.

The notation on the form is contrary to the foreman's statement in another part of his testimony. He was asked what he did with the truck after the complaint was received that the brakes were faulty. He answered:

"We held the vehicle and repaired the defect in the braking mechanism."

The damage to the roof of the truck was repaired, although when it was done was not shown. Except for whatever time was required to do the body work, there is nothing to show where the truck was between April 3 and April 11 or what, if any, use was made of it during that period.

The plaintiff adduced no proof at the trial, expert or otherwise, as to what, if anything, specific was defective about the brakes at the time of the accident. Likewise there was no proof to suggest that the truck had suffered an accident or any kind of an untoward incident, which did affect or which might have affected the brakes, from the time it left the yard in the morning until the collision with the overhead structure. Nor was evidence introduced of any travel over uneven or bumpy roads during the trip.

## I.

The circumstances under which the verdict in favor of the defendant was returned are strongly indicative that the jury found no negligence on the part of the defendant and no contributory negligence on the part of the plaintiff. The record reveals that during their deliberations the jury sent a note to the judge saying:

"If we feel that there is insufficient evidence to prove that either party is guilty of negligence—can we use this as a cause for throwing the case out?"

After an affirmative answer from the judge, the jury again retired and in about five minutes returned with the defendant's verdict. On this appeal, although plaintiff challenges the propriety of the trial court's action in submitting the issue of his contributory negligence to the jury, he accepts the finding that the failure of the brakes at the time of the accident was not chargeable to negligence on defendant's part. Plaintiff seeks a reversal of the adverse judgment, however, on the ground that the contractual relationship between Hertz and his employer gave rise to an implied continuing promissory warranty by Hertz that the truck in question was fit for the purposes for which plaintiff's employer rented it, *i. e.,* operation and transportation of goods on the public highways. He urges further that under the proof adduced the failure of the brakes and the consequent accident created a factual issue for jury determination as to whether there was a breach of the implied warranty. Therefore he claims the court erred in refusing to submit that issue for jury consideration.

*Schipper v. Levitt & Sons, Inc.,* 44 *N. J.* 70 (1965), *Santor v. A & M Karagheusian, Inc.,* 44 *N. J.* 52 (1965), and *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960), have made it plain that if the relationship in the present case between Contract Packers and Hertz were manufacturer or dealer and purchaser, an implied warranty of fit-

ness for operation on the public highway would have come into existence at the time of the sale. Moreover, under those cases, breach of the warranty which caused personal injury to an employee of the purchaser would be actionable by the employee. It must be recognized, however, that the occasions have been relatively few when the courts have been asked to imply warranties in personal injury cases as an incident of transactions other than sales of chattels. Certainly in New Jersey there is no case precisely like this one involving the contention that a bailment for hire of a motor vehicle by a bailor or lessor engaged in such rental business carries with it an implied warranty that the rented vehicle is fit and will continue to be fit for the rental period for the ordinary and expected purposes of the rental.

There is no good reason for restricting such warranties to sales. Warranties of fitness are regarded by law as an incident of a transaction because one party to the relationship is in a better position than the other to know and control the condition of the chattel transferred and to distribute the losses which may occur because of a dangerous condition the chattel possesses. These factors make it likely that the party acquiring possession of the article will assume it is in a safe condition for use and therefore refrain from taking precautionary measures himself. 2 *Harper and James, Torts,* § 28.19 (1956). Harper and James point out that the presence of such factors in sales set in motion the development of the doctrine of implied warranties. They decry the notion, however, that because the doctrine had its origin in sales, the warranty protection should be withheld in other situations when the same considerations obtain. And they argue persuasively that in the face of present-day forms of business enterprise, development of the warranty doctrine in sales should point the way by suggestive analogy to similar results in cases where a commodity is leased. *Id.,* at *p.* 1577.

In this connection it may be observed also that the comment to the warranty section of the Uniform Commercial Code

speaks out against confining warranties to sales transactions. The comment says:

"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract of sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire, whether such bailment is itself the main contract or is merely a supplying of containers under a contract for the sale of their contents. * * *" See Comment, *N. J. S.* 12A:2–313, *p.* 190, *n.* 2.

See also, *Prosser, Torts,* § 95, *pp.* 655–656 (*3d ed.* 1964); 1 *Frumer and Friedman, Products Liability,* § 19.02 (1964); *Vold, Sales,* § 94, *p.* 454, *fn.* 42a (*2d ed.* 1959); Annotation, 68 *A. L. R. 2d* 850 (1959); and see Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 *Colum. L. Rev.* 653, 673–674 (1957):

"The expansion of enterprises engaged solely in bailment for hire seems to justify increasing imposition of absolute warranties, at least to the extent that they would be imposed upon a seller of similarly used goods. In addition, reliance is greater than in the typical sale, for it is generally true that the bailee for hire spends less time shopping for the article than he would in selecting like goods to be purchased, and since the item is not one he expects to own, he will usually be less competent in judging its quality."

A sale transfers ownership and possession of the article in exchange for the price; a bailment for hire transfers possession in exchange for the rental and contemplates eventual return of the article to the owner. By means of a bailment parties can often reach the same business ends that can be achieved by selling and buying. The goods come to the user for the time being and he benefits by their use and enjoyment without the burdens of becoming and remaining the owner. The owner-lessor benefits by receiving the rent for the temporary use. *Vold, Sales, supra,* § 4, *p.* 24.

■ We may take judicial notice of the growth of the business of renting motor vehicles, trucks and pleasure cars.[1]

■ The nature of the U-drive-it enterprise is such that a heavy burden of responsibility for the safety of lessees and for members of the public must be imposed upon it. The courts have long accepted the fact that defective trucks and cars are dangerous instrumentalities on highways. They present great potentiality for harm to other highway users as well as to their own drivers and passengers. Therefore the offering to the public of trucks and pleasure vehicles for hire necessarily carries with it a representation that they are fit for operation. This representation is of major significance because both new and used cars and trucks are rented. In fact, as we were advised at oral argument, the rental rates are the same whether a new or used vehicle is supplied. In other words, the lessor

---

[1] See Mahoney, "It's Hertz Itself in the Driver's Seat," *Fortune*, Oct. 1963, *p.* 119.

"About 98 percent of [Hertz'] $155-million revenues last year came from the short-term rental (one hour to one month) and the long-term leasing (generally two years and up) of the 35,000 cars and 18,000 trucks that make up the Hertz-owned fleet. Car rental brought in $77 million; the leasing and renting of trucks, $60 million; and the long-term leasing of cars, $14 million. Hertz is the leader in all three of these sectors of its industry, * * *.

Over the past five years, industry-wide revenues increased at a startling annual rate of some 15 percent.
* * * * * * * *

The company keeps maintenance costs low by getting rid of its cars before major repairs are necessary * * *."

The article notes that Hertz has engaged in "aggressive, insistent advertising." An advertising agency devised the slogan, "Let Hertz put *you* in the driver's seat," and it "has been dinned into the ears of TV audiences ever since." *Id.*, at *p.* 228. One can hardly conceive of a more persuasive representation that lessees may rely on Hertz vehicles as being fit for use.

A Hertz illustrated booklet about its truck leasing service entitled "You ask *Me* The Questions About Hertz Truck Lease Service," issued by Hertz System, Inc. (1963) says:

"1. Why should We Lease Trucks?

* * * [W]e can give you far better service than you can provide for yourself *plus* complete freedom from the responsibilities of truck operation." at *pp.* 2–3

in effect says to the customer that the representation of fitness for use is the same whether the vehicle supplied is new or old. From the standpoint of service to the customer, therefore, the law cannot justly accept any distinction between the obligation assumed by a U-drive-it company whether the vehicle is new or old when rented. The nature of the business is such that the customer is expected to, and in fact must, rely ordinarily on the express or implied representation of fitness for immediate use. *Cf. Donner v. Morse Auto Rentals, Inc.,* 147 *So. 2d* 577 (*Fla. D. Ct. App.* 1962); *Yarbrough v. Ball U-Drive-System,* 48 *So. 2d* 82 (*Fla. Sup. Ct.* 1950). To illustrate, if a traveler comes into an airport and needs a car for a short period and rents one from a U-drive-it agency, when he is "put in the driver's seat" his reliance on the fitness of the car assigned to him for the rental period whether new or used usually is absolute. In such circumstances the relationship between the parties fairly calls for an implied warranty of

---

"5. Who Takes Care of Gas? What About Maintenance? And What Happens If One Of The Trucks Requires Repairs On The Road?

We will fill your tanks regularly * * *. We take care of maintenance too—greasing, oil changes, preventive maintenance, inspections, plus all repairs, repainting, cleanings, and washings! Most of the work is done at night, or during the off hours of your business. Hertz is on the job 24 hours a day, 7 days a week.

And * * * when it is necessary to hold a truck for repairs—either in the garage or on the road—*we furnish a replacement vehicle at no extra charge.* In fact, Hertz maintains a fleet of brand-new trucks for emergency cargo pick-ups on the road!" at *pp.* 10, 11

On the last page the booklet says:

"Hertz Truck-Lease *guarantees uninterrupted service.*" at *p.* 24 (All eemphasis Hertz'.)

In the June 26, 1965 issue of *Saturday Review,* the following advertisement appears:

"When a Hertz car comes home to roost, we give it a complete physical. We make sure that your shiny Chevrolet or other fine car is bright all over, inside and out. That's why Hertz and only Hertz has the gumption to offer Certified Service, the world's first rent-a-car guarantee. This is the plan that assures you of satisfaction or pays you $50 in car rental certificates. Ask any Doctor, Lawyer, Indian Chief and they'll probably agree completely with Hertz: Quality means attention to detail."

fitness for use, at least equal to that assumed by a new car manufacturer. The content of such warranty must be that the car will not fail mechanically during the rental period.

In the case before us, it is just as obvious that when a company like Contract Packers rents trucks for limited or extended periods for use in its occupation of transportation of goods, it too relies on the express or implied representation of the person in the business of supplying vehicles for hire, that they are fit for such use.

■ A bailor for hire, such as a person in the U-drive-it business, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer. In fact such a bailor puts the vehicle he buys and then rents to the public to more sustained use on the highways than most ordinary car purchasers. The very nature of the business is such that the bailee, his employees, passengers and the traveling public are exposed to a greater *quantum* of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer. We held in *Santor* the liability of the manufacturer might be expressed in terms of strict liability in tort. *Santor v. A & M. Karagheusian, Inc., supra* (44 *N. J.*, at *pp.* 66–67) ; see also, *Restatement (Second), Torts,* § 402A, comment m, *pp.* 9–10 (*Tent. Draft No.* 10, 1964). By analogy the same rule should be made applicable to the U-drive-it bailor-bailee relationship. Such a rental must be regarded as accompanied by a representation that the vehicle is fit for operation on the public highways.

■■ When the implied warranty or representation of fitness arises, for how long should it be considered viable ? Since the exposure of the user and the public to harm is great if the rented vehicle fails during ordinary use on a highway, the answer must be that it continues for the agreed rental period. The public interests involved are justly served only by treating an obligation of that nature as an incident of the business enterprise. The operator of the rental business must be regarded as possessing expertise with respect to the service life and fitness of his vehicles for use. That expertise ought to put

him in a better position than the bailee to detect or to anticipate flaws or defects or fatigue in his vehicles. Moreover, as between bailor for hire and bailee the liability for flaws or defects not discoverable by ordinary care in inspecting or testing ought to rest with the bailor just as it rests with a manufacturer who buys components containing latent defects from another maker, and installs them in the completed product, or just as it rests with a retailer at the point of sale to the consumer. And, with respect to failure of a rented vehicle from fatigue, since control of the length of the lease is in the lessor, such risk is one which, in the interest of the consuming public as well as of the members of the public traveling the highways, ought to be imposed on the rental business.

▆ The warranty or representation of fitness is not dependent upon existence of Hertz' additional undertaking to service and maintain the trucks while they were leased. That undertaking serves particularly to instill reliance in Contract Packers upon mechanical operability of the trucks throughout the rental period. But the warranty or representation that the vehicles will not fail for that period sprang into existence on the making of the agreement to rent the trucks, and was an incident thereof irrespective of the service and maintenance undertaking. From the standpoint of the U-drive-it company, the agreement to keep them in repair is important as a source of revenue. But, in addition, it furnishes a means of protection for the bailor in discharging the obligation of the warranty or representation. The retained supervision and control permit Hertz to see to it that the vehicles remain fit for use, or to withdraw them from operation and replace them if the estimated service life is at or approaching an end, or if for any reason continued fitness for use is questionable.

▆ In view of the foregoing discussion of legal principles, it becomes necessary to decide whether the evidence adduced at the trial is sufficient to require determination by the jury as to whether the truck furnished by defendant was fit for use on the day of the accident. We are satisfied that the

proof was adequate for the purpose. Putting aside plaintiff's claim that the brakes had not been working properly on three successive days of the previous week, it does appear that on test by Sottilare before leaving his employer's lot on the morning of the mishap, they seemed all right. Moreover, they functioned on the long trip between 7:00 A.M. and noon when they failed completely on application to avoid collision with the overhead trestle. As Cintrone described it, although Sottilare was pumping the brakes, the truck just kept on going ahead. These circumstances justify the inference that the brakes were defective. And the inference is strengthened by the Hertz foreman's testimony that on April 11 when the brakes were reported as faulty, the defect in the braking mechanism was repaired.

Accordingly, we are of the opinion (1) that the leasing agreement gave rise to a continuing implied promissory warranty that the leased trucks would be fit for plaintiff's employer's use for the duration of the lease, (2) that the nature of the U-drive-it business is such that the responsibility of Hertz may properly be stated in terms of strict liability in tort (*cf. Greeno v. Clark Equipment Company,* 237 *F. Supp.* 427 (*N. D. Ind.* 1965)), and (3) that the evidence created a factual issue for determination by the jury as to whether defendant Hertz had been guilty of a breach of that warranty which produced the collision and plaintiff's injury.

It is true that the trial jury disposed of the issue of Hertz' negligence. But, as the *Levitt, Santor* and *Henningsen* cases reveal, freedom from negligence is not a defense to a breach of warranty or to an action based on strict liability in tort. In such actions the liability is strict. If the facts show a defective condition constituting a breach of the applicable warranty or a breach of the duty to provide a truck fit for use, and the condition produces injury or damages, liability exists. *Cf. Santor v. A & M Karagheusian, Inc., supra* (44 *N. J.,* at *pp.* 66–67) ; *Henningsen v. Bloomfield Motors, Inc., supra* (32 *N. J.,* at *pp.* 372, 409–412) ; *Prosser, Torts, supra, pp.* 651–653. Strict liability in tort does not make an

insurer of the person subject to the duty to provide a truck safe for use. Happening of an accident without more, would not establish liability. There must be proof of such a failure of the truck as shows a breach of the warranty or breach of the duty to supply a vehicle fit for the agreed period of use. For example, if a rented vehicle was driven around a curve at such an excessive rate of speed that the driver lost control and struck a pole, the cause would not be failure of the vehicle, but failure of the driver. Here, as we have said, a factual issue exists as to whether the brakes were defective and the collision and plaintiff's injuries resulted from the defect. The jury must pass upon the credibility of the various witnesses; they must resolve the factual conflicts in the testimony about the condition of the brakes and whether a defective braking mechanism was repaired after the accident; and they must decide whether the collision was occasioned by defective brakes or by Sottilare's failure to see or to judge reasonably the clearance of the overhead structure.

The views expressed herein find analogical support in other jurisdictions. In *Delaney v. Towmotor Corporation,* 339 *F. 2d* 4 (*2 Cir.* 1964), a fork lift truck manufactured by Towmotor, containing an overhead guard made by another corporation, was delivered to T. Hogan & Sons, a stevedore, by a distributor at Towmotor's request. It was delivered as a demonstrator so the stevedore could "try it out and get acquainted with our newer type of equipment." Delaney, an employee of Hogan, was operating the fork lift, commonly called a hilo, on a pier seven weeks later and was injured when the overhead guard collapsed. In spite of the fact that the relationship between Towmotor and plaintiff's employer was one of bailment and not sale, Towmotor was held to strict liaiblity in tort, and Delaney's judgment against it for his injuries was sustained.

No distinction in principle was regarded as resulting from a bailment rather than a sale or the fork lift truck. Judge Friendly, speaking for the Court of Appeals for the Second Federal Circuit, indicated the references to sales in the cases

and texts would be considered "as a description of the situation that has most commonly arisen rather than as a deliberate limitation of the principle to cases where the product has been sold, intentionally excluding instances where a manufacturer has placed a defective article in the stream of commerce by other means." He said further:

"We can see no sensible reason why Delaney's rights against Towmotor should be less extensive on the facts here than if Towmotor had first sold the hilo to its distributor, or than if it had sold the machine to Hogan (plaintiff's employer), for a nominal down payment, subject to return if Hogan was not satisfied after a trial period." (Insertion ours.) 339 *F. 2d*, at *p.* 6.

In *Booth Steamship Co. v. Meier & Oelhaf Co.*, 262 *F. 2d* 310 (2 *Cir.* 1958), the Meier Company, machinists, contracted to overhaul the engines of a Booth vessel. The work entailed extracting tight-fitting cylinder liners from the engine block. This was done by extracting equipment consisting of a rigid bar, or strongback, which was attached to the liner, and a jack which was used to raise the liner by raising the strongback. Because the lifting arm of the jack was relatively short, it was necessary periodically to suspend the strongback holding the liner from a wire strap while the jack itself was lifted up. While the strongback was thus suspended, the strap parted allowing the strongback to fall and sever the thumb of an employee of Meier who was working on the jack aboard the vessel. He recovered a judgment against Booth on the theory of an unseaworthy condition of the vessel resulting from the presence of defective equipment supplied by the contractor. Booth then sought indemnity against the Meier Company alleging negligence and breach of implied warranty of fitness of the extracting equipment. It was agreed there was no negligence on the part of Booth or Meier with respect to the wire strap which parted. The defect was latent; it was not one which could have been detected by a reasonably careful visual examination. The court, however, held that in supplying the equipment as part of its repair contract, the Meier Company

was subject to an implied warranty of workmanlike service, and the parting of the wire strap constituted a breach of the warranty, which established its liability regardless of fault.

In declaring the Meier Company obligated to indemnify Booth for the damages Booth paid, the court indicated that the liability of suppliers of equipment in situations such as the one then under consideration should be coextensive with those of the law of sales. More specifically, Judge Lumbard said:

"Like the manufacturer or retailer the supplier profits from the bailment or lease of his equipment. Although he is unable to prevent defects arising in the course of manufacture, his expert knowledge of the characteristics of the equipment in use should enable him to detect them more readily than the user. It is therefore not less reasonable as an incident of his contract to charge him with the duty of making tests, the omission of which would not constitute negligence, than it is to charge the manufacturer or retailer with a similar responsibility. We think that this is particularly true when the chattel is supplied, as it presumably was here, in the partial fulfillment of a general undertaking to make repairs. In such circumstances the hirer defers to the special qualifications of the contractor in both the selection and use of the equipment. Relying on the supplier's control of the work and with confidence in the supplier's expert knowledge and competence, he makes at most only a routine inspection of the equipment employed. To say that the supplier warrants the equipment merely confirms the customary reliance which flows from such a relationship and which affords an appropriate remedy." 262 *F*. 2*d*, at *p*. 314.

The court said also that latent defects which are undiscoverable on ordinary visual inspection might result from defective manufacture or from fatigue resulting from use over a period of time. With respect to the latter, "it is the supplier and not the ship-owner who knows the actual history of prior use of the equipment. *He alone is in the position to establish such retirement schedules or periodic retests as will best prevent the development of visually undetectable flaws.*" *Id.*, at *p*. 314. (Emphasis added)

In *Gambino v. John Lucas & Co.*, 263 *App. Div.* 1054, 34 *N. Y. S.* 2*d* 383 (*App. Div.* 1942), defendant leased a machine to the plaintiff. While in use the fuel tank exploded injuring plaintiff. Although not the manufacturer, defendant

was held liable for breach of an implied warranty that the machine was safe and suitable for the use intended.

Although the cited cases are not identical with the one before us or with the many products liability cases based on sales and concepts of implied warranty and strict liability in tort which are filling the reports of most jurisdictions, we think the analogy is compelling. In this developing area of the law we perceive no sound reason why a distinction in principle should be made between the sale of a truck to plaintiff's employer by a manufacturer, and a lease for hire of the character established by the evidence. Farnsworth, *supra* (57 *Colum. L. Rev.,* at *pp.* 667–674) ; and see *Greeno v. Clark Equipment Company, supra; Simpson v. Powered Products of Michigan, Inc.,* 24 *Conn. Sup.* 409, 192 *A. 2d* 555 (*C. P.* 1963) ; *Eastern Motor Express, Inc. v. A. Maschmeijer, Jr., Inc.,* 247 *F. 2d* 826, 65 *A. L. R. 2d* 765 (2 *Cir.* 1957), *cert.* denied 355 *U. S.* 959, 78 *S. Ct.* 535, 2 *L. Ed. 2d* 534 (1958) ; *Hoisting Engine Sales Co. v. Hart,* 237 *N. Y.* 30, 142 *N. E.* 342, 344, 31 *A. L. R.* 536 (*Ct. App.* 1923). Most of the significant criteria which in sales transactions give rise to an implied warranty of fitness or which support a cause of action based on strict liability in tort, are present in the type of lessor-lessee relationship now before us. (1) The risk of harm to the lessee, his employees, passengers, and members of the public from the operation of a defective truck on the highways is great; (2) the representation of the lessor that the vehicles are fit for use for the lessee's purposes is of major proportions. (The service, maintenance and repair undertaking in this case, said to give "complete freedom from the responsibilities of truck operation," magnifies the representation of fitness.) ; (3) the reliance of the lessee on the representation of the lessor is bound to be great. (For example, there is no evidence to indicate that Contract Packers maintained any service or repair mechanics on its own staff. Moreover, the inducement offered to the consumer through advertising and solicitation encourages reliance by him on the fitness of the vehicle and on the skill and expertise of the lessor.)

For the reasons stated, the trial judge should have submitted the issue of breach of implied warranty of fitness to the jury for determination. His refusal to do so constituted reversible error. (A cause of action expressed in terms of strict liability in tort was not pleaded by plaintiff. This may now be considered more apt since *Santor v. A & M Karagheusian, Inc., supra;* and see *Greeno v. Clark Equipment Company, supra.*)

## II.

 Defendant contends that since there is no privity of contract between plaintiff and Hertz, plaintiff has no cause of action for breach of an implied warranty of fitness arising from the bailment relationship created thereby. Obviously Hertz knew when the leasing took place that Contract Packers' employees would be using the trucks as drivers or helpers. In such a situation absence of privity between plaintiff and Hertz is of no legal consequence. *Schipper v. Levitt & Sons, Inc., supra; Santor v. A & M Karagheusian, Inc., supra; Henningsen v. Bloomfield Motors, Inc., supra.*

Moreover, as we have said, when a U-drive-it company, by a lease arrangement such as in this case, makes trucks available for rental knowing they will be dangerous to users and members of the public, if defective, a representation exists that they are fit for such use. If a mishap occurs while they are being operated by the lessee or his employees which constitutes a breach of that representation, the lessor is subjected to strict liability in tort for resultant injuries to such employees. In the framework of such a right of action, absence of privity of contract between the injured person and Hertz is immaterial. *Prosser, Torts, supra,* at *p.* 652.

## III.

Plaintiff argues that contributory negligence is not a defense to an action for breach of warranty, and therefore it was error for the trial court to submit that issue to the jury for decision.

There is confusion and some conflict in the cases as to whether plaintiff's negligence in using a warranted but defective article creates a bar to recovery. Various opinions and texts speak in terms of the effect of contributory negligence, assumption of risk and misuse of the product on the injured person's right of recovery. It has been suggested that the problem is largely one of semantics, and that for the most part the apparently conflicting decisions can be reconciled. Prosser's study of the cases led him to this conclusion:

"If the cases are examined, it readily appears that those which refuse to allow the defense have been cases in which the plaintiff negligently failed to discover the defect in the product, or to guard against the possibility of its existence. They are entirely consistent with the general rule that such negligence is not a defense to an action founded upon strict liability. Those which have permitted the defense all have been cases in which the plaintiff has discovered the defect and the danger, and has proceeded nevertheless to make use of the product. They represent the form of contributory negligence which consists of deliberately and unreasonably proceeding to encounter a known danger, and overlaps assumption of risk. They are quite consistent with the general rule that this is a defense to strict liability. There are only a few cases which have recognized the distinction; but it seems quite clear that it is made in fact." *Prosser, Torts, supra*, at *pp*. 656–657.

And see Wade, "Strict Tort Liability of Manufacturers," 19 *Sw. L. J.* 5, 21–22 (1965) ; Keeton, "Assumption of Products Risks," 19 *Sw. L. J.* 61, 66–75 (1965) ; 1 *Frumer and Friedman, Products Liability, supra*, § 16.01[3].

Comment n to § 402A of the Tentative Draft No. 10 of the *Restatement (Second), Torts* (1964), accepts the Prosser view. And see note, "The Role of Contributory Negligence in Warranty Actions," 36 *So. Cal. L. Rev.* 490 (1963) ; Note, "Contributory Negligence in Warranty Law," 15 *U. Fla. L. Rev.* 85 (1962) ; also, *Meistrich v. Casino Arena Attractions, Inc.*, 31 *N. J.* 44, 49, 55 (1959).

There is no need to pursue the specifics of the problem at length in this case. We are satisfied the evidence adduced justified submitting to the jury the issue of contribu-

tory negligence. As we have detailed above, plaintiff said he reported faulty brakes at the end of each of the three days of the week previous to the accident on which he drove the truck in question. But the credibility of that testimony is clearly in issue. Hertz had no record of the alleged complaints or of any repairs to the brakes before the accident. It is likewise inferable that Cintrone's employer had no copies of the A.V.D. forms allegedly made out by him, because none was produced at the trial. Moreover, no testimony was offered to show efforts by Cintrone to obtain them from his employer or to require their production as evidence. Accordingly, it was open to the jury to find that although the brakes were defective he did not report it to Hertz or to his employer. True, Sottilare said Cintrone told him about the faulty brakes before he drove the truck from the yard, and that on test they appeared to be working. However, Cintrone made no such statement in his testimony. The jury was not obliged to believe Sottilare's assertion, and could have concluded that neither the alleged communication by Cintrone, nor the alleged brake test by Sottilare took place. In addition, the jury might have accepted the portion of the Hertz foreman's testimony that a defect in the braking mechanism was repaired after the accident.

From all of this proof the jury could have concluded the brakes were defective, that Cintrone knew it for some days before the accident but neglected to report the condition, and that with such knowledge he rode in the loaded truck for several hours until the brakes failed and caused the truck to collide with the overhead structure. On such a finding an ultimate conclusion was possible, i. e., that Cintrone with knowledge of the danger presented by the defective brakes failed to take the care for his own safety which a reasonably prudent person would have taken under the circumstances. Therefore, it would have been improper for the trial court to have removed the defense of contributory negligence from jury consideration.

## IV.

For the reasons stated, the judgment for the defendant is reversed, and the cause is remanded for a new trial to be had in accordance with the views outlined.

PROCTOR, J. (concurring). I agree that the lessor of a new or used vehicle should be subject to strict liability for defects existing in the vehicle at the time the lessee acquires possession. I cannot, however, agree with that part of the majority opinion which states that the lessor will be liable for any defect which arises during the leasing period where such period is for an extended length of time.

I understand that there is a developing practice for corporations and individuals to lease new vehicles for a year or more, and themselves provide for maintenance. It would seem that in such a situation the lessor's liability should be no greater than that of the manufacturer of the vehicle—liability for injuries caused by a defect which existed when the vehicle left the manufacturer's control. *Jakubowski v. Minnesota Mining and Manufacturing*, 42 N. J. 177, 182 (1964). The lessor's liability in this type of lease, which is so different from the one before us in the present case, should not be determined now.

The record here indicates that there was an agreement between the lessor and lessee that the lessor would be responsible for all maintenance and repairs. In short, the lessor assumed the obligation to keep the vehicle in a safe running condition. To that end the lessor regained control of the vehicle at the end of each day when it was "gassed up" at its garage. Apparently, the lessee's only obligation was to notify the lessor of known defects. In these circumstances, the situation is the same as if the vehicle were leased anew each day from the lessor. Thus I think a new warranty of fitness for use on the highways came into being at the beginning of each working day. I therefore disagree with that part of the dissenting opinion which separates the original lease from the servicing

agreement. To my mind they were integral components of a single agreement and inseparable.

There was evidence in the case (although its credibility is somewhat suspect) that the brakes were defective for several days prior to the accident, and that the plaintiff so notified the lessor on three occasions. From this and other evidence set out in the majority opinion the jury could have found that there was a defect in the brakes at the beginning of the working day on which the accident happened; and that the defect caused the accident resulting in plaintiff's injuries. Thus the warranty issue should have been submitted to the jury. I agree with the majority's discussion of contributory negligence. I therefore concur in the result reached by the majority.

HALL, J. (dissenting). The majority holds in terms of strict liability in tort, *Santor v. A & M Karagheusian, Inc.,* 44 *N. J.* 52, 63–67 (1965), that "the leasing agreement gave rise to a continuing implied promissory warranty [by the lessor] that the leased trucks would be fit for plaintiff's employer's use for the duration of the lease." Fitness for use is stated to mean "that the car will not fail mechanically during the rental period." The failure giving rise to liability may come from any cause whatever—a defect in manufacture or design, some condition developing independently and subsequently, whether or not discoverable by ordinary care in inspection or testing, and even from fatigue or wearing out. It is made plain that whether the lease is for one day or a period of years, whether the rented vehicle is new or used or whether the lessor undertakes to service and maintain it during the lease makes no difference as far as the nature and extent of liability is concerned. I assume also that any attempt to limit responsibility by the leasing contract would be found unavailing. It therefore seems to me it has to be said that the effect of the majority opinion is to make the supplier of a vehicle for hire practically an insuror, on policy grounds, at least as far as the lessee, his employees and passengers are concerned,

for the consequences of any mechanical failure during the lease, assuming, of course, that the failure was the proximate cause of the injury or damage and that the plaintiff was not guilty of contributory fault. (I may say at the outset that I have no quarrel with extending strict liability to commercial transactions other than outright sales, in this day when many articles are rented for use rather than purchased, or including among the beneficiaries of the doctrine those beyond the lessee himself in the categories mentioned.)

Up to this point in the development of the law in this field, both in this State and elsewhere as far as I have been able to determine, strict liability in tort has been imposed only in case of a damage-causing defect in manufacture or design existing at the time it left the hands of the manufacturer or the supplier sought to be charged. The so-called warranty is not a promissory one. *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960); *Courtois v. General Motors Corp.,* 37 *N. J.* 525 (1962); *Jakubowski v. Minnesota Mining and Manufacturing,* 42 *N. J.* 177 (1964); *Santor v. A & M Karagheusian, Inc., supra* (44 *N. J.* 52); *Schipper v. Levitt & Sons, Inc.,* 44 *N. J.* 70 (1965). For leading cases elsewhere, see, *e. g., Greenman v. Yuba Power Products, Inc.,* 59 *Cal. 2d* 57, 27 *Cal. Rptr.* 697, 377 *P. 2d* 897 (*Sup. Ct.* 1962); *Putman v. Erie City Manufacturing Company,* 338 *F. 2d* 911 (5 *Cir.* 1964). This was also the basis of liability in the bailment case of *Delaney v. Towmotor Corporation,* 339 *F. 2d* 4 (2 *Cir.* 1964), relied on by the majority.

The "defect" criterion does offer difficulties which have become apparent in the practical application of the strict liability doctrine. What is a "defect"? How is it related to the usual or expected life of the article and its quality and price? We have earlier had occasion at least to mention and make some comment on these ramifications. See *Courtois, supra* (37 *N. J.,* at *p.* 543), *Jakubowski, supra* (42 *N. J.,* at *p.* 185) and *Santor, supra* (44 *N. J.,* at *p.* 67). And courts are still grappling with the difficult problem of the basis and extent of strict liability against the seller of a *used* chattel. Granted

also that in the case of a lease of a motor vehicle for hire, not only are the problems just mentioned frequently present in complicated measure, but in addition we have particularly great reliance by the lessee on the lessor as well as the important factor of placing a potentially dangerous mechanism in the stream of highway traffic. While the responsibility of such a lessor should be a commensurately heavy one, and the matter of how to define and limit it is certainly not an easy question, it ought to be approached, as a policy matter, from the standpoint of balancing all the interests involved. Not to be overlooked is the obvious economic impact on this particular service industry in the light of the important function it has come to serve in today's society. In my view, the majority goes too far in imposing strict liability for all leased vehicle failures irrespective of cause — a much greater burden than has been so far imposed on any analogous entrepreneur.

I would think that it would be both fair and adequate to say that a vehicle renter ought to be subject to strict liability in tort for the consequences of "defects," in the *Henningsen* sense of that word, existing at the time of each particular rental and should only be liable for happenings during the lease occasioned other than by such "defects" on a negligence basis, *i. e.,* lack of reasonable care in inspection, repair or replacement and preventive maintenance prior to the particular lease (or during the course of it when the rental is an extended one and the lessor undertakes the obligation of periodic service and maintenance during the period). Indeed, an undertaking by the lessor to service and maintain the trucks during the lease period might be thought of as negating any complete warranty. A rented motor vehicle is hardly comparable to the absolute liability situations of explosives or packaged food or bottled drugs. Many things happen to an automobile during use, including sudden and spontaneous brake failure, which can neither be connected with defective manufacture nor prevented by the most careful prior servicing, and such happenings seem even more likely to occur when the driver is not the owner but merely hiring transportation. If

the lessee of a car were to ride on a public bus or railroad train instead, the transportation company would not be under absolute liability to him if he were injured, no matter what the cause, but would be subject only to the duty of exercising a high degree of care. It seems to me unjustified to impose a so much greater obligation in the rented car situation.

Dealing specifically with the case at hand, the circumstances are such that I do not think that this Court ought to consider the warranty theory. The presentation of plaintiff's case indicates to me that he had abandoned it. While the complaint contained a second count alleging only that the "vehicle was fit and safe for use" and a breach thereof, and the pre-trial order repeated the contention but expressly tied it to the undertaking by "the contract of rental * * * to keep said vehicle in good order and repair," plaintiff's counsel made no mention at all of it in his opening (as the trial judge pointed out) and dealt only with negligence—breach of duty of ordinary care in maintenance and repair.

Nothing but that duty appears to have been thought of during the plaintiff's case until defendant moved to strike the warranty count at the conclusion of plaintiff's evidence (decision on which was reserved by the trial judge and granted after the proofs on both sides had been concluded). Plaintiff's proofs were not directed to a warranty theory and I doubt that they make out a case thereon. (Indeed the presentation at the trial level on both sides was superficial and the evidence sparse on which to consider and determine a landmark legal principle. Perhaps this was because the case appears to be quite a trivial one, the plaintiff having only a $3.00 hospital bill and but small other out-of-pocket expenses, with the suit started on the day before the statute of limitations would have barred it.) The terms of the lease upon which to ground a thesis of strict liability were not introduced. Although the majority says they were testified to, the only real proofs along this line came on defendant's case from the night foreman of defendant's Jersey City garage who spoke solely of the servicing practices with respect to the Hertz trucks used by plaintiff's employees. The majority finds it necessary to bring in a book-

let circulated by defendant about its truck leasing service which is not in evidence, as well as a magazine article and advertisement, all published long after this lease and accident. Moreover, it seems to me, that plaintiff offered no sufficient evidence of what the alleged mechanical failure or defect was, although such proofs should have been available through defendant's records if the failure had actually occurred. I had thought that under our decision in *Jakubowski, supra* (42 *N. J.*, at *pp.* 183–184), at least this minimum *quantum* of direct or inferential proof is required of a plaintiff in any strict liability case. All in all, the warranty theory projected on this appeal is at best only a fortuitous circumstance.

Nor would plaintiff be prejudiced, in my opinion, if this Court declined to consider it. The primary issue in the case, which the trial court charged the jury to determine first, was what brought the accident about, *i. e.,* the fact question of whether the driver was trying to take an eleven-foot-high truck through an overpass having a clearance of only nine and one-half feet and that any brake failure had nothing to do with the accident. The nature of the jury request for further instructions is as well open to the interpretation that an affirmative answer to this question was the basis of its general verdict of no cause of action—a result which the jury could very properly reach under the proofs. While I fully appreciate that an appellate court may not ordinarily weigh the evidence, it does not reverse and order a second trial unless a trial error has been prejudicial, *R. R.* 1:5–3(b), and in deciding that question, it looks at the realities of a situation. Not only do I see no error in the circumstances here, but, even if there were, plaintiff was not harmed.

I would affirm the judgment of the trial court.

HANEMAN, J., joins in this dissent.

PROCTOR, J., concurring in result.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—5.

*For affirmance*—Justices HALL and HANEMAN—2.