630 So.2d 1067 (1994)
SAMUEL FRIEDLAND FAMILY ENTERPRISES, etc., et al., Petitioners,
v.
Paula AMOROSO, et vir., et al., Respondents.
No. 80786.
Supreme Court of Florida.
January 27, 1994.
Richard A. Sherman and Rosemary B. Wilder of the Law Offices of Richard A. Sherman, P.A., and Gregg J. Pomeroy of Pomeroy, Pomeroy & Beauchamp, P.A., Fort Lauderdale, for petitioners.
C. Robert Murray, Jr. of Canning, Murray & Peltz, P.A., Miami, for respondent.
David L. Willis and Donald H. Benson of Vernis & Bowling, P.A., Fort Lauderdale, for Robin Rhodenbaugh and Rhodenbaugh's Sheet Metal Repairs, Inc.
GRIMES, Justice.
We review Amoroso v. Samuel Friedland Family Enterprises, 604 So.2d 827, 835 (Fla. 4th DCA 1992), in which the court certified the following question as being of great public importance:
WHETHER THE DOCTRINE OF STRICT LIABILITY AS TO DEFECTIVE PRODUCTS EXTENDS TO COMMERCIAL LEASE TRANSACTIONS OF THOSE PRODUCTS?
We have jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution.
The Diplomat Hotel is a waterfront property in Hollywood, Florida. Sunrise Water Sports, Inc. (Sunrise) leased part of the Diplomat's property and operated a sailboat rental stand there. The boats are owned by Sunrise. However, the actual rentals are handled by Atlantic Sailing Center, Inc. (Atlantic) which subleases the rental stand and was organized to operate the rental business at the Diplomat.
The Amorosos were guests at the Diplomat and rented sailboats on three occasions. The third time, Mrs. Amoroso was injured when the sailboat's crossbar broke. As a result of her injuries, Mr. and Mrs. Amoroso sued the Diplomat, Sunrise, Atlantic, and a welder who had repaired the crossbar a few days before the accident.
*1068 The Amorosos asserted a claim in strict liability against the Diplomat, Sunrise, and Atlantic.[1] The trial court directed verdicts in favor of all of the defendants on this claim. The district court of appeal reversed. The court recognized that strict liability is a valid theory of recovery in Florida and held that the doctrine of strict liability extends to commercial lease transactions.[2]
The underlying basis for the doctrine of strict liability is that those entities within a product's distributive chain "who profit from the sale or distribution of [the product] to the public, rather than an innocent person injured by it, should bear the financial burden of even an undetectable product defect." North Miami General Hosp., Inc. v. Goldberg, 520 So.2d 650, 651 (Fla. 3d DCA 1988). Those entities are in a better position to ensure the safety of the products they market, to insure against defects in those products, and to spread the cost of any injuries resulting from a defect.
This Court adopted the doctrine of strict liability, as stated by the A.L.I. Restatement (Second) of Torts section 402A (1965), in West v. Caterpillar Tractor Co., 336 So.2d 80, 87 (Fla. 1976).[3] In West, an individual who was injured by a negligently designed grader brought a strict liability action against the manufacturer of the grader. Id. at 82. In adopting strict liability, we recognized that a manufacturer, who places a potentially dangerous product on the market and encourages its use, undertakes a special responsibility toward members of the public who may be injured by the product. Id. at 86. Since West, Florida courts have expanded the doctrine of strict liability to others in the distributive chain including retailers, wholesalers, and distributors. Mobley v. South Florida Beverage Corp., 500 So.2d 292 (Fla. 3d DCA 1986) (retailers), review denied, 509 So.2d 1117 (Fla. 1987); Visnoski v. J.C. Penney Co., 477 So.2d 29 (Fla. 2d DCA 1985) (distributors); Perry v. Luby Chevrolet, Inc., 446 So.2d 1150 (Fla. 3d DCA 1984) (retailers); Adobe Bldg. Centers, Inc. v. Reynolds, 403 So.2d 1033 (Fla. 4th DCA) (retailers and wholesalers), review dismissed, 411 So.2d 380 (Fla. 1981). In the instant case, we must decide whether the doctrine of strict liability applies to commercial lessors.
In addition to the court below, several other district courts of appeal have already applied the doctrine to commercial lessors. American Aerial Lift, Inc. v. Perez, 629 So.2d 169 (Fla. 3d DCA 1993); Futch v. Ryder Truck Rental, Inc., 391 So.2d 808 (Fla. 5th DCA 1980); Ford v. Highlands Insurance Co., 369 So.2d 77 (Fla. 1st DCA), cert. denied, 378 So.2d 345 (Fla. 1979). The courts of many other states have also held that commercial lessors can be held strictly liable for defective products they lease. Allan E. Korpela, Annotation, Products Liability: Application of Strict Liability in Tort Doctrine to Lessor of Personal Property, 52 A.L.R.3d 121 (1973).
In Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769, 778-79 (1965), the New Jersey Supreme Court held that a truck rental company could *1069 be held strictly liable for injuries caused by a defective condition in one of the trucks it leased. In reaching this conclusion, the court found little difference between sales and lease transactions, and recognized that, like a purchaser of new goods, a lessee is entitled to expect that a product is being delivered in a nondefective condition. Id., 212 A.2d at 776-77. In fact, after taking note of the growth of the car and truck rental business, the court suggested that the rationale for imposing strict liability on manufacturers and sellers may even be greater in the context of leased goods as a lessee usually has less opportunity to inspect items and lessors, by repeatedly introducing and reintroducing products into the stream of commerce, are exposing the public to a proportionately greater risk of injury. Id.
In Price v. Shell Oil Co., 2 Cal.3d 245, 85 Cal. Rptr. 178, 179, 466 P.2d 722, 723 (1970), the Supreme Court of California also addressed the application of strict liability to commercial lease transactions. Price involved an aircraft mechanic who was injured when a ladder, which was attached to a gasoline truck, broke. Id., 85 Cal. Rptr. at 179-80, 466 P.2d at 723-24. The truck was leased by the mechanic's employer from Shell Oil Company. Id. at 182, 466 P.2d at 726.
Prior to Price, California courts had applied the doctrine of strict tort liability to manufacturers, retailers, suppliers of personal property, and residential builders. Id. at 181-82, 466 P.2d at 725-26. In determining whether to further expand the strict liability cause of action, the court reasoned:
Such a broad philosophy evolves naturally from the purpose of imposing strict liability which "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." [Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 701, 377 P.2d 897, 901 (1963).] Essentially the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them... .
... [W]e can perceive no substantial difference between sellers of personal property and non-sellers, such as bailors and lessors. In each instance, the seller or non-seller "places [an article] on the market, knowing that it is to be used without inspection for defects, ... ." [Greenman, 27 Cal. Rptr. at 700, 377 P.2d at 900.] In light of the policy to be subserved, it should make no difference that the party distributing the article has retained title to it. Nor can we see how the risk of harm associated with the use of the chattel can vary with the legal form under which it is held. Having in mind the market realities and the widespread use of the lease of personalty in today's business world, we think it makes good sense to impose on the lessors of chattels the same liability for physical harm which has been imposed on the manufacturers and retailers. The former, like the latter, are able to bear the cost of compensating for injuries resulting from defects by spreading the loss through an adjustment of the rental.
Price, 85 Cal. Rptr. at 181-82, 466 P.2d at 725-26 (footnote omitted). The court concluded that lessors can be held strictly liable. Id. at 179, 466 P.2d at 723. However, this holding was limited to those lessors "found to be in the business of leasing, in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing." Id. at 184, 466 P.2d at 728. To do otherwise would work an injustice on those lessors who cannot adjust the costs associated with strict liability in an economically viable manner, such as where the lease is an isolated transaction. Id. at 183, 466 P.2d at 727.
The Diplomat argues that the district court opinion in the instant case "casts too wide a net." They contend that applying the doctrine of strict liability to all commercial lease transactions is unfair. It would cause a vast increase in potential liability which small businesses in Florida would be unable to bear. Thus, if we were to apply the doctrine of strict liability to commercial lease transactions, the Diplomat urges us to limit our *1070 holding to those lessors who are "mass dealers in chattel."
However, we note that no state which has applied strict liability to lessors has retreated from this view because of its economic consequences on commercial leasing. Also, we can find no express authority for the proposition that the doctrine of strict liability should be limited to those lessors who can be called "mass dealers in chattel," and, if such authority does exist, it is certainly a minority view. For purposes of applying strict liability, we can discern no reason to differentiate between a business which is a mass dealer in a product and one which is not, provided each is actually engaged in the business of leasing the defective product.
The Diplomat next contends that lessors should be treated similarly to sellers of used goods in strict liability actions, and cites Keith v. Russell T. Bundy & Associates, Inc., 495 So.2d 1223, 1228 (Fla. 5th DCA 1986), in which the court refused to apply the doctrine of strict liability to a dealer in used equipment. We disagree.
Lessors and the sellers of used goods are not necessarily analogous in light of the policies underlying strict tort liability. The Supreme Court of Wisconsin rejected a similar argument in holding that the doctrine of strict liability applied to commercial lessors. Kemp v. Miller, 154 Wis.2d 538, 453 N.W.2d 872, 879 (1990). Prior to Kemp, the court had held that "a seller of used products was subject to strict liability for manufacturing and design defects but was not subject to strict liability for defects arising after a product left the manufacturer and the original seller." Id.; Burrows v. Follett & Leach, Inc., 115 Wis.2d 272, 340 N.W.2d 485 (1983). Attempting to limit the application of strict liability, the lessor argued that it "should be subject to strict liability to the same extent as a seller of used products." Id.
Discussing the unique position of sellers of used products, the court stated:
This court's decision in Burrows is based on the realization that the imposition of strict liability on a seller of used products, for defects that arise after manufacture and before the product reaches the seller, places the risk of loss associated with the use of defective products on one who has neither created nor assumed the risk and on one who is not in a position to implement procedures to avoid the distribution of defective products in the future. Defects in a used product typically arise before the product reaches the seller and while the product was in the hands of an unknown previous owner. The used product seller is rarely familiar with the prior history of the products he or she sells and can discover and correct latent defects in those products only at great cost by means of individual inspection. See Chattel Leasing, 48 U.Pitt.L.Rev. at 334. Further, the used goods market generally operates on the understanding that the seller makes no particular assurance as to quality simply by offering a product for sale. See Tillman v. Vance Equipment Co., 286 Or. 747, 755, 596 P.2d 1299, 1303 (1979).
Kemp, 453 N.W.2d at 879.
The court then explained that commercial lessors are in a different position regarding the products they lease.
[T]he imposition of strict liability on a commercial lessor, for defects that arise after manufacture and while the product is under the ownership and control of the lessor, places the risk of loss associated with the use of defective products on one who created and assumed the risk and on one who can implement procedures to avoid the distribution of defective products in the future. Defects in a leased product may surface or be discovered after a product reaches the lessor. The commercial lessor is familiar with the characteristics and prior history of the products he or she leases and is in a position to discover and correct defects in those products by means of routine inspection, servicing, and repair. Further, by placing products on the market, the commercial lessor impliedly represents that those products will be fit for use throughout the term of the lease and, consequently, assumes the risk of damages resulting from a defective product.
Id. Accord American Aerial Lift v. Perez.
Mindful of the recent growth of the commercial leasing business in recent years, *1071 we believe that the rationale justifying the imposition of strict liability on manufacturers and sellers is also applicable to commercial lessors. Thus, we hold that the doctrine of strict liability is applicable to commercial lease transactions in Florida. However, we limit our holding to those lessors who are engaged in the business of leasing the allegedly defective product. The strict liability cause of action is not applicable to those leases which are isolated or infrequent transactions not related to the principal business of the lessor. See Kemp, 453 N.W.2d at 880; Price, 85 Cal. Rptr. at 184, 466 P.2d at 728; Bachner v. Pearson, 479 P.2d 319, 328 (Alaska 1970).
We turn now to the facts presented by the instant case. Sunrise leased the property on which the sailboat rental stand was located and owned the sailboats which were rented from the stand. The company was clearly engaged in the business of leasing sailboats and, therefore, could properly be held strictly liable for leasing a defective boat to the Amorosos.
The question of the Diplomat's liability is more difficult. The Diplomat is, of course, a hotel, and would not commonly be considered to be in the business of renting sailboats. On the other hand, the Diplomat leased its property to Sunrise specifically for the purpose of establishing a sailboat rental business and the hotel was actively involved in marketing the boats to its guests. The district court noted:
The Diplomat placed brochures in each room advertising the availability of sailing at the hotel. The rental stand was on the Diplomat Beach... . [N]either Sunrise nor Atlantic were identified as the owner or operator at the beach. The sailboats were paid for by charging them to the room and leaving the room key as security for the rental. Mrs. Amoroso also testified that she saw in the brochure a sail with the Diplomat logo on it... . [T]his evidence taken together was sufficient to show that the Diplomat represented to their guests that the sailboat rental stand was a part of the hotel operations.

Amoroso, 604 So.2d at 831 (emphasis added). The emphasized portion is particularly significant. The record reflects that, when the Amorosos, and presumably the other hotel guests, rented a boat, they reasonably believed that they were renting it from the Diplomat. Further, the Amorosos were entitled to expect that the sailboat was being delivered to them in a safe, nondefective condition. We find that, under the circumstances presented here, the hotel's involvement was sufficient to sustain a strict liability cause of action against it as a lessor engaged in the business of leasing the sailboats.
Accordingly, we answer the certified question in the affirmative. We approve the district court's holding that the doctrine of strict liability is applicable to commercial lease transactions, subject to the limitations set forth in this opinion, and we approve the application of the doctrine to Sunrise and the Diplomat in this case.
It is so ordered.
BARKETT, C.J., and SHAW, KOGAN and HARDING, JJ., concur.
McDONALD, J., concurs in part and dissents in part with an opinion, in which OVERTON, J., concurs.
McDONALD, Justice, concurring in part, dissenting in part.
I fully concur with the decision under review insofar as it holds that the Diplomat and Sunrise may be held liable under the theories of implied warranty of fitness and negligence. There clearly is an implied warranty of fitness for ordinary use in the leasing of boats by a hotel, its agents, or its franchisees, to members of the public. Strict liability, on the other hand, has serious overtones. I do not feel it is appropriate to apply this doctrine to a hotel where the furnishing of rental boats is an incidental part of its business. I thus dissent to that part of the majority opinion extending strict liability to the Diplomat in this case. The implied warranty of fitness and negligence theories are adequate to protect the public.
OVERTON, J., concurs.
NOTES
[1] The Amorosos also asserted claims for negligent repair and maintenance and breach of implied warranties of fitness and merchantability against the Diplomat, Sunrise, and Atlantic, and negligence against the welder. Both the trial court and the district court addressed these causes of action and the Diplomat, in its brief to this Court, assigns error to a number of the rulings below. However, as those issues are not within the scope of the certified question, we have elected not to address them.
[2] While the Diplomat was not the lessor of the sailboat, as such, the court held that there was sufficient evidence to prove that Sunrise was operating its business under the apparent authority of the Diplomat.
[3] The Restatement definition provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.