Joaquim Magalhaes **MARTINS FERRE- IRA**, Arnaldo Magalhaes Martins Ferreira, Jose Magalhaes Martins Ferreira, individually, and as a partnership trading as Martins Ferreira and Irmaos, Plaintiffs,

v.

**JAYESS CORP.**, Sepenuk & Sons Corp., Alexander Rodrigues and Mack Sepenuk, Defendants.

Civ. A. No. 978-60.

United States District Court
D. New Jersey.

Feb. 28, 1963.

---

1. Shehee v. Aetna Casualty & Surety Co. (W.D.La.) 122 F.Supp. 1, l. c. 7–8.

Meyer Linnick, Newark, N. J., Jerome Teich, New York City, of counsel, for plaintiffs.

Aaron Marder, Newark, N. J., for defendants Jayess Corp., Sepenuk & Sons Corp. and Mack Sepenuk.

Checki & Politan, by Nicholas H. Politan, Lyndhurst, N. J., for defendant Marques (Rodrigues).

WORTENDYKE, District Judge.

The plaintiffs in this case are three citizens of Portugal, who sue here in their individual capacities, and as members of a partnership. The complaint, filed on November 16, 1960, names as defendants Mack Sepenuk, Sepenuk & Sons

Corp., and Jayess Corp. (all of whom will be hereinafter described and referred to as the Jayess defendants, or Jayess), and Alexander Rodrigues, properly known as Alexander V. Marques, t/a Lusitania Export Agency (hereinafter Marques). Jurisdiction in this Court is predicated upon 28 U.S.C.A. § 1332.

Count 1 of the three-count complaint alleges that the defendants (acting as either principals, agents or assignees) entered into an agreement with the plaintiffs for the sale of a quantity of copper known as "light copper" in the trade, for which the plaintiffs agreed to pay the sum of $44,010. Plaintiffs further allege that on or about July 15, 1957, and on subsequent dates, the defendants shipped to the plaintiffs copper which they represented to be, but which was not in fact, of the quality specified in the contract. Plaintiffs charge that the failure of the copper shipped to conform with the description specified in the contract constituted a breach of implied and express warranty, to their damage in the sum of $25,000.

The second count, reiterative of the same factual basis, charges that defendants falsely and fraudulently, with intent to deceive, represented that the copper to be furnished would be of the grade known as "light copper", while then knowing that said representation was false. Plaintiffs, claiming to have relied upon such representation, seek allegedly resultant damages, in the amount of $50,000.

The third count charges a conspiracy between the defendants to defraud and deceive the plaintiffs. In this count also, the ad damnum is $50,000.

The Jayess defendants deny the alleged warranty, misrepresentation and conspiracy. The same defendants further plead that by accepting and paying for the copper shipped, plaintiffs have waived any right to claim damages based upon the alleged inferior quality of the merchandise.

We need not here consider the answer of Marques, because the complaint as to

him has been dismissed on motion, for lack of jurisdiction; it having been established that he, as well as all of the plaintiffs, are citizens of Portugal. Marques remains in the case in prosecution of certain cross-claims which he has filed against the Jayess defendants, to which they, in turn, have counterclaimed against him.

On November 27, 1962, when this case was moved for trial, it was agreed by the parties, with the consent of the Court, that only the issue of the liability of the Jayess defendants to the plaintiffs be then tried, and that the remaining questions should await the determination of the Court upon that issue.

When the trial commenced, the plaintiffs called Marques as their first witness, and attempted to question him without the use of an interpreter, over the objection of the Jayess defendants. It became immediately apparent to the Court that the language limitations of the witness rendered his testimony unintelligible without competent interpretation. Lacking an interpreter of Portuguese, the parties agreed to submit this phase of the case to the Court upon the depositions, including the exhibits marked at the taking thereof, and the pleadings on file, together with the oral testimony which had been given before the Court.

I find the following facts:

In 1957 Alexander V. Marques resided at 190 Walnut Street, Newark, New Jersey, from which address he conducted business under the name of Lusitania Export Agency. In that year he learned, through the Portuguese Vice-Consul's office in Philadelphia, that in 1955 a Portuguese concern had made inquiry by letter respecting sources from which it might purchase scrap copper. With this letter in hand, Marques set about locating sellers of metal who might be able to supply him in the event of a sales agreement with the author of the letter. Marques was referred to the office of Sepenuk & Sons, where he discussed with Mack Sepenuk the possibility of selling copper to a Portuguese company, with which he had been placed in contact. He obtained

from Mr. Sepenuk prices for light copper, light copper number 1 and number 2, and yellow heavy brass. Marques then prepared his own price list, having in mind the prices quoted to him by Sepenuk, for the materials in question, and transmitted his offer to sell by letter, dated March 16, 1957, to the plaintiffs. The terms of sale contained in this letter contemplated shipment of the specified merchandise C.I.F. Tagus or Porto, Portugal, upon a letter of credit being opened in Marques' favor in a New York bank. By their responsive letter dated March 22, 1957, plaintiffs offered to purchase 15 tons of light copper at $578.00 per ton, C.I.F. Porto, and revealed that they were opening credit for the total amount of this purchase. This offer was accepted by Marques by letter dated March 30, 1957. On May 17, 1957, a further order for 60 tons of light copper at $600, and 50 tons of yellow brass, was confirmed by Marques' letter to plaintiffs. Jayess entered into a written contract dated May 17, 1957, to sell to Marques 60 metric tons of light copper scrap at 24¾¢ per pound, and 50 metric tons of yellow brass scrap at 19½¢ per pound, F.A.S. Coast ports, with any freight in excess of that from New York to be borne by Jayess. The contract required Marques to open an irrevocable letter of credit acceptable to and in favor of Jayess, on or before May 24, 1957, at the Chase National Bank in New York City. Marques undertook to obtain a proper export license. Payment was required against commercial invoice of Marques, weight certificates, and dock receipts. The first 15 tons were shipped on the S.S. Ribiera Grande on either June 22 or June 26, 1957. A letter of credit in the amount of $9,000 had been issued to Marques, who in turn assigned it to Jayess. The cost of insurance in the amount of $79.94 was borne by the plaintiffs. Jayess, upon presentation of the proper forms to the Chase Manhattan Bank, received its $9,000 and paid to Marques the amount in excess of the price quoted by the Jayess defendants, in three installments of $200, $200 and $473.12, on the respective dates of June 13, June 20 and June 28, 1957. The forms referred to, which were required by the bank, were filled out by Barian Shipping Company, acting upon the request of Marques, which company also presented them for payment.

From the inception of its negotiations with Marques, Jayess had insisted upon assurance of letters of credit in its favor. In addition to the one for $9,000 referred to above, Marques assigned another letter of credit in the amount of $35,010 which was covered by Advice No. E–694854, from the Chase Manhattan Bank, on May 24, 1957. This second letter of credit was to cover the 60 tons of light copper specified in the contract of May 17, 1957 between Jayess and Marques (the sale of the 50 tons of brass referred to was never consummated by shipment). The second purchase of copper was shipped on two vessels; 26.9145 metric tons on the S.S. Fortuna, on July 31st, and 32.8760 metric tons on the S.S. Monte Brasil, on August 8, 1957. The invoices for these shipments were prepared by Jayess upon forms supplied by Marques, which bore his business name as consignor. On June 29, July 2, and July 18, 1957, Jayess wrote checks totalling $600, in equal respective amounts, to Marques, at his request, to enable him to cover the cost of freight which, in each instance, was to be borne by him, as in each case the insurance costs were assumed by the plaintiffs.

At the end of July, Marques received notification from plaintiffs that the copper supplied was inferior in quality to that specified in the contract. When he carried the complaint to Mack Sepenuk, the latter assured him he had nothing to worry about, and that the quality of the merchandise was as represented. When asked about the 60 ton order, Sepenuk said that the material for the S.S. Fortuna had been delivered, but that for the S.S. Monte Brasil was either on the trucks or was half-way delivered. Marques indicated that the plaintiffs wanted these shipments held up, and Sepenuk told him to make whatever arrangements he could at the pier.

By this time, Sepenuk had already received an assignment of the $35,010 letter of credit, upon which he ultimately collected. Unlike the circumstances of the first shipment, the shipping documents in the second instance were prepared and submitted by Intra-Mar Shipping Co., the forwarding agent, acting on the request of the Jayess defendants. The only documents prepared by Jayess were the Lusitania Export Agency invoices, and its own.

As a result of legal difficulties by reason of the Portuguese bank's refusal to honor the letter of credit, Jayess had to put it in the hands of an attorney, who did collect thereon, and paid to Jayess $34,575.91 (the difference between the amount received and the face amount of the letter of credit, being the cost of collection). There was due to Jayess $32,624.45 for the materials delivered, at the price they had quoted, but the difference was not turned over to Marques, as was done on the first order, because Jayess paid Intra-Mar Shipping Co. respective payments of $1,218.53 and $1,053.88, and also $685.67 for insurance.

In September of the same year, Marques went to Portugal, seeking to adjust plaintiffs' claims upon the alleged quality defects of the merchandise, and received from the plaintiffs an offer of compromise upon a reduction in cost to them of $4,000. This offer was communicated to the Jayess defendants by Marques, but was rejected.

While the bales of metal were being prepared for shipment, Marques watched at least part of the process, apparently to ensure that what was shipped was in conformity with what he had ordered. Many bales which went to make up the second (60 ton) order were sent directly from the suppliers of Jayess to the dock. However, the original complaint was directed to the first 15 ton shipment, all of which was baled and packed in the yard of J. Sepenuk & Sons. The export licenses for all shipments were obtained by Marques.

Plaintiffs base their asserted right to the relief which they seek against the Jayess defendants upon two alternative theories. First, they say that Marques was acting as agent during the period of negotiations for sale, for an undisclosed principal,—namely, Jayess. Implicit in, if not the essential element of any definition of agency, is an authorization by one to another to act on his behalf. Jayess contracted with Marques at arm's length. Each dealt with the other as a principal. The record is devoid of proof of any authorization to Marques by Jayess to act on its behalf or for its account. Equally clear, from the evidence is that the plaintiffs dealt with Marques as a principal who promised to provide certain merchandise at stated prices, which fact excludes any conclusion of brokerage. A "broker" is one whose duty is to bring parties together and he is, in effect, a go-between whose responsibility it is to effect agreement between the parties. Thomas v. Commissioner of Internal Revenue, 1958, 5 Cir., 254 F.2d 233. "The true definition of a broker seems to be that he is an agent, employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation * * *. Properly speaking, a broker is a mere negotiator between the other parties, and he never acts in his own name, but in the names of those who employ him: * * * He is strictly therefore, a middle man, or intermediate negotiator between the parties." Story on Agency, § 28. The second aspect of plaintiffs' theory, as set forth in the pretrial order, is disclosed by their contention that Jayess was the assignee of Marques' contract with the plaintiffs. As with the first theory, this contention also must fall for lack of proof. When negotiations were first initiated between Marques and Jayess, the former told this metal supplier that there was someone overseas who might want to buy some scrap metal. Thereafter, as we have seen, Marques arrived at a contract with the plaintiffs, in his own name, and at prices which were in excess of those quoted to him by Jayess. Then Marques went back to Jayess and consummated another contract.

728

Upon the trial Marques testified that upon receiving the respective orders for 15 and 60 tons, and the related letters of credit, he displaced these orders to Mack Sepenuk, who agreed to "take care of everything." I do not find that this statement alone, bearing in mind the other evidence adduced, constitutes a legal assignment. Marques asserts without hesitation that Jayess never knew the prices at which he was selling the scrap to the plaintiffs, although, of course, Jayess could ascertain these prices from its knowledge of the amounts of the letters of credit and the quantities ordered; the inference is clear that during the period in question, Marques considered it none of Jayess' business what price he was charging to the plaintiffs. The most that can be said is that Marques delegated his duty, within the definition of that expression as set forth in Vol. 4 Corbin on Contracts, 1951, § 866, so as to give plaintiffs rights as obligee beneficiaries under the Jayess contract. But it is clear from the complaint and the nature of the action, that the suit in question is based upon the theory of warranty. Buying goods known in the trade as "light copper" constitutes a sale by description within the definition of the Uniform Sales Act (subsequently replaced by the Uniform Commercial Code, N.J.S.A. § 12A:1–101 et seq., but not here applicable) which gives rise to an implied warranty that the goods will conform to those ordered. N.J.S.A. 46:30–20. It is well-established that in such suits it is necessary for the plaintiff to prove privity of contract with the defendant, which privity is lacking in this case. There are exceptions to the privity doctrine, notable among which is that recently established by the New Jersey Supreme Court in Henningsen v. Bloomfield Motors, Inc., 1960, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1, where the Court allowed the wife of a purchaser of a Plymouth automobile to recover damages for her personal injuries, sustained while driving the car, from the automobile manufacturer, upon the doctrine of implied warranty, despite the absence of contractual privity. The *ratio decidendi*, at least in part, is disclosed in the Court's stated awareness of the changes in marketing techniques in today's society, where sales are no longer made face-to-face, but rather through intermediaries. Even so, the Court limited its decision to sales of commodities presenting a risk of injury to life or limb; leaving unmodified the general common law rule of contracts that only those persons who are parties to a bargain can sue for breach of it. The opinion cites numerous other cases, most of them involving food or drugs, where the general rule has been abrogated. In all of these cases the particular fact patterns presented are distinguishable from the situation in the case at bar. I do not find that any necessity has been shown justifying the abrogation of the requirement of privity as a condition precedent to the right to recover in this case. The Jayess defendants made no representations to the plaintiffs respecting the quality of or advertised their merchandise; nor, indeed, had the Jayess defendants any knowledge of the identity of the plaintiffs, other than the address which was provided for shipment of the merchandise. Accordingly, count 1 of the complaint must fall.

Counts 2 and 3 both sound in fraud; the latter also alleging a conspiracy to commit the same between Marques and the Jayess defendants. Essential elements of fraud are misrepresentation by the defendant of a material fact, made with intent to deceive and reliance thereon by the plaintiffs to their detriment. The evidence before me is totally lacking in any basis for inference that Jayess made any representations with intent to deceive the plaintiffs, or that Marques and Jayess conspired to defraud the plaintiffs. The complaint is dismissed as to the defendants Jayess Corp., Sepenuk & Sons Corp., and Mack Sepenuk, with costs.

The foregoing shall constitute my findings of fact and conclusions of law in accordance with F.R.Civ.P. 52(a). Let an order be submitted.