ORLANDO SANTIAGO, PLAINTIFF-APPELLANT, v. E.W. BLISS DIVISION, GULF AND WESTERN MANUFACTURING COMPANY, DEFENDANT-APPELLANT, v. ALEXANDER BROWN–CAPITOL MACHINE, XYZ CORPORATION, (FICTITIOUS NAME), DEF CORPORATION, (FICTITIOUS NAME), DOE CORPORATION, (FICTITIOUS NAME), AND WESTERN ELECTRIC COMPANY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 3, 1984—Decided May 21, 1985.

208

Before Judges KING and DEIGHAN.

*Michael B. Oropollo* argued the cause for appellant E.B. Bliss (*Hoagland, Longo, Oropollo & Morgan,* attorneys; *Michael B. Oropollo* and *Catherine Cookson,* on the brief and reply letter memorandum).

*Dennis M. Donnelly* argued the cause for appellant Orlando Santiago (*Blume, Vazquez, Goldfaden, Berkowitz & Oliveras,* attorneys; *Dennis M. Donnelly,* on the letter brief).

*Robert J. Schoenberg* argued the cause for respondent AT & T Technologies, Inc.[1] (*Riker, Danzig, Scherer & Hyland,* attorneys; *Robert J. Schoenberg,* on the brief).

The opinion of the court was delivered by

DEIGHAN, J.A.D.

On this appeal we are required to determine whether an occasional sale of a product such as a punch press by a user, not engaged in the activity as a manufacturer, distributor, supplier or retailer of the product as part of its business, may be strictly liable under § 402A(1) of the *Restatement, Torts,* 2d. for injuries resulting from a subsequent use of the product. In *Green v. Sterling Extruder Corp.,* 95 *N.J.* 263, 269 (1984), the Supreme Court reviewed an unreported opinion of this court which affirmed the trial court's determination that a bankruptcy sale of defendant's plastic blow-molding machine was not a sale in the ordinary course of business as required under the

---

[1] Western Electric Company, Inc. changed its corporate name to AT & T Technologies, Inc. in connection with the restructuring of the Bell System on January 1, 1984. For consistency, this defendant will be referred to as "Western Electric."

principles of strict liability. On appeal, the plaintiff did not seek a review of that holding and the Supreme Court cautioned that no conclusion was to be drawn as to how it would resolve the issue had it been presented. *Id.* at 269. Here, a judicial sale is not involved.

Plaintiff Orlando Santiago instituted this action for personal injuries based on negligence, strict liability and products liability against E.W. Bliss Division-Gulf and Western Manufacturing Company (Bliss), Alexander Brown-Capitol Machine, Western Electric Company, Inc., (Western Electric) and other defendants not involved in the present proceedings. Plaintiff and Bliss appeal from a summary judgment dismissing the complaint and crossclaims against Western Electric. On application, we granted leave to appeal. *R*.2:2–4. The facts are not disputed.

On January 12, 1982 plaintiff Orlando Santiago was employed as a punch press operator by Springfield Electrical Specialties, Inc. · During the course of his employment he reached into the point of operation of an unguarded punch press to remove a finished part. As he did so, the ram of the punch press thrust downward and plaintiff sustained an amputation of his left index finger and an avulsion wound of his left thumb. The press component of the punch press used by plaintiff was built by Bliss in 1929 and purchased by Western Electric from Bliss in March 1930.

Bliss, who has been designing and selling punch presses since 1857, does not supply point of operation guarding on general purpose presses. This is because the type and dimensions of guarding will vary according to the purpose and use of the press. Only after the design layout of the punch press with all its components is determined by the user, can the proper guarding be designed for the particular use and operation of the press. The ultimate user then assembles the press with other components of the metal forming system such as feeding, stock and tooling. For this reason, Western Electric was required to design the guarding component for the specialized

use for which the press was purchased in 1930. Although specifications were prepared by Western Electric as an incident to its business, it routinely designed modifications to general purpose machinery to fit its specialized needs. In addition to the guarding components for the press, drawings were submitted to Bliss with respect to the connection, crankshaft, motor drive starting and lighting equipment, automatic air valve and bolster plate. Also, all electric equipment and wiring was in accordance with Western Electric's specifications. Various other component parts were also supplied by Western Electric to Bliss for integration into the press.

In September 1953, after 23 years of use and almost 30 years before the incident involved in these proceedings, Western Electric sold the used punch press to an unidentified purchaser. In the following years, several other businesses owned the punch press. Bliss' records indicate that in 1972 a business known as "Howmedica" apparently owned or possessed the punch press because it asked Bliss for a manual. Sometime thereafter, Condor Industries came into possession of the punch press and used it for manufacturing operations. It was then transferred to defendant equipment brokers, Alexander Brown-Capitol Machine in July 1977, who in turn sold it to plaintiff's employer in April 1981.

Substantial changes from the original design by Western Electric were made to the punch press at the time plaintiff was injured. The most obvious change was the removal of the safety guard and its connecting linkage. The absence of any such safety guard is the principal basis of plaintiff's cause of action. The complaint contains counts in negligence, strict liability, and breach of warranty arising out of the design, manufacture, sale and distribution of the punch press which plaintiff was operating at the time he was injured.

In the course of preparation of the case for trial, plaintiff engaged the services of an expert, Louis Howarth, P.E. In a report dated June 24, 1982, Mr. Howarth asserted that

[t]he press was foot-pedal operated by Springfield Specialties. The point of operation region was unguarded, and in the die set was a die similar to the one which was used at the time of your client's accident.

\* \* \* \* \* \* \* \*

The actuating medium for this particular press was a foot treadle which causes the clutch to engage and the ram descends upon pressing of the foot pedal. As one continues to hold down the foot pedal, the ram will continue to cycle up and down until the foot treadle is released.

\* \* \* \* \* \* \* \*

Bliss did not use prudent engineering in the design and fabrication of this power press. They did not comply with known codes and standards which existed at the time that this machine was manufactured.

\* \* \* \* \* \* \* \*

There were means, as indicated by cited patents, by which interlocking systems could have been utilized so that the operator was required to utilize both hands prior to actuation of the press with the use of foot pedal. Guards could have been fixed about the point of operation.

\* \* \* \* \* \* \* \*

Signs should have been posted prominently so that they would alert the operator to the hazards of placing his hands underneath the point of operation region.

On December 20, 1983, Western Electric served interrogatories upon plaintiff in response to which plaintiff admitted: "We have no information in our possession indicating any liability on your part."

After completion of discovery the case was listed for trial on April 2, 1984. Trial was adjourned at the request of Bliss to June 18, 1984. On June 1, 1984, Western Electric moved for summary judgment relying on an affidavit of Edward Parker, the senior engineer who has been with Western Electric since 1957. Parker stated that he was familiar with the business operations of Western Electric, especially the purchase, use and disposition of manufacturing equipment such as punch presses, press brakes and shears. He related that Western Electric has never been engaged in the business of manufacturing, selling, distributing or designing punch presses or safety guards or devices for such equipment. Western Electric uses punch presses as part of its manufacturing operations to produce

telephone equipment and related parts, components and cables for the Bell System.

He declared that the records of Western Electric indicate that the press was purchased in about March of 1930 and that the only alterations, modifications or additions made by Western Electric were the addition of an electric switch and heel rest in April 1930, and a covering over the flywheel and foot treadle in December 1933. Further, there are no indications that Western Electric altered or removed any other part from the punch press.

Parker then stated that he was familiar with Western Electric's business practice of disposing of unwanted machinery such as the punch press involved in this matter. He noted that at the time of the disposition of the press by Western Electric it was nearly 24-years-old, and that Western Electric always sells its unneeded equipment "as is" without warranties to brokers who specialize in used equipment of that type. He advised that the punch press was sold in September 1953 to an unspecified purchaser. No opposing affidavits or certifications were submitted.

In a report dated April 11, 1984, the engineer of Bliss, James Lewis, outlined substantial changes in the punch press from its original condition to the condition at the time of the examination on April 3, 1984. Mr. Lewis observed that:

the treadle was originally installed 7 inches above the floor and had a [h]eavy return spring as shown in photo 8005, so it would have required approximately 40 pounds force to depress the treadle, a distance of 2 inches, which is the minimum distance that would have been required to trip the clutch. Also, the treadle was fixed in its location and could have moved in only a vertical direction, so that operator always knew the location of the treadle and could not depress it by any type of sideways motion such as shuffling his feet against the treadle. Photograph 2 shows the spring bracket SB, mounted on the press frame, but the spring is not visible. When we inspected the press there was a short compression spring attached to this spring bracket. It was not the large heavy spring that was originally provided by Bliss.

* * * * * * * *

These photographs, as well as my examination of the press, confirm that the single stroke device originally provided by Bliss had been disconnected and was

completely inoperative. Therefore the press would continue stroking as long as the foot treadle was held depressed. It would stop top stroke [sic] as soon as the foot treadle was released.

A feature that was originally provided by Bliss and is now completely missing is the mechanical sweep device, which was attached in such a manner that it would sweep in front of the die area thus pushing anyones [sic] hands away from the point of operation, before the die closed when the foot treadle was depressed. This sweep device and its connecting linkage to the foot treadle is clearly shown in its original form on photographs 8005 and 8006.

A comparison of photograph 8 with photos 8005 and 8006 reveals that the bolster is now made of steel instead of cast iron and is larger in area and thinner than the original bolster.

The original press included a lever mounted below the motor for the purpose of raising or lowering the motor and thus bringing its friction drive wheel into or out of contact with the perifery of the flywheel. This mechanism has been removed and the motor is always connected to the flywheel by means of V belts.

On June 7, 1984, plaintiff amended his answers to interrogatories with an oral report of Mr. Howarth. In substance the oral report states that the guard provided was inadequate and rendered the machine manufactured and supplied by Bliss defective; that Bliss had an obligation to alert and advise Western Electric; that the sweep guard was inadequate to protect workers from injury at the point of operation; that they further had the obligation to advise the purchaser of proper guarding techniques; that defendant and "any seller or supplier" had an obligation to give detailed instructions and warnings to subsequent purchasers and users of the machine; that a proper guard such as a two-hand trip and barrier or gate guard which was interlocked must never be removed without replacing them with similar approved devices; that instructions and warnings should have been placed in a manual annexed to the machine or a tag or sign on the machine; that the warnings should include pictorial representation which would show the danger of placing hands in the point of operation, and that the failure of Bliss and the "other suppliers" of this machine to comply with these obligations was a substantial factor in causing the plaintiff's injuries.

Plaintiff and Bliss contend that: (1) under the concept of strict liability Western Electric is liable as designer of the safety guard as well as other component parts; (2) summary judgment was improperly granted because genuine issues of material facts remain concerning the negligence of Western Electric's ownership, maintenance, sale and design of the punch press, and (3) the oral amendment of the expert's report after the date for trial was first fixed, in violation of *R.*4:17–7, did not prejudice Western Electric and manifest injustice will result if applied to the remaining defendant but not to Western Electric.

Western Electric contends that the products liability claim against it was properly dismissed because it is not engaged in the business of selling punch presses and that the negligence claims likewise were properly dismissed because of a failure to produce any material facts to support the claims of negligence.

Under the principle of strict liability, if at the time the seller distributes a product, it is not fit, suitable and safe for its intended or reasonably foreseeable purposes so that users and others who may be expected to come in contact with the product are injured as a result thereof, then the seller shall be responsible for the ensuing damages. *Suter v. San Angelo Foundry & Machine Co.,* 81 *N.J.* 150, 169 (1979). A defect in the design of a manufactured product may constitute a basis for strict products liability in tort. *Michalko v. Cooke Color & Chem. Corp.,* 91 *N.J.* 386, 394 (1982). The requisite elements of a *prima facie* case of strict liability for design defects are: (1) the product design was defective; (2) the defect existed when the product was distributed by and under the control of defendant, and (3) the defect caused injury to a reasonably foreseeable user. *Soler v. Castmaster, Div. of H.P.M. Corp.,* 98 *N.J.* 137, 145 (1984); *O'Brien v. Muskin Corp.,* 94 *N.J.* 169, 179 (1983). Proof that the product caused the injury is not sufficient to establish that the product was defectively manufactured. *Id.* The necessity of proving a defect in the product at the time the manufacturer placed it into the stream of

commerce distinguishes strict from absolute liability and prevents the manufacturer from also becoming an insurer of a product. *Id.* at 179–180.

■■ The doctrine of strict liability applies to the seller of a defective product if, among other things, the seller is "engaged in the business" of selling such product. 2 *Restatement, Torts,* 2d, § 402A (1965). The doctrine has developed primarily in actions against manufacturers and sellers who place products in the stream of commerce. *E.g., Brown v. United States Stove Co.,* 98 *N.J.* 155 (1984); *Soler v. Castmaster, Div. of H.P.M. Corp., supra; O'Brien v. Muskin Corp., supra; Michalko v. Cooke Color & Chem, Corp., supra; Suter v. San Angelo Foundry & Machine Co., supra.* However, the rule of strict liability does not apply to an occasional seller who is not engaged in the activity as a part of its business. *Restatement, supra,* § 402A, comment *f.*

In order to bring Western Electric within the doctrine of strict liability in the first instance, Bliss points out that this doctrine has been applied to the sale of used products. *Realmuto v. Straub Motors,* 65 *N.J.* 336 (1974); *Turner v. International Harvester's,* 133 *N.J.Super.* 277 (Law Div.1975). This undoubtedly is true. See Annotation, "Strict liability in tort: Liability of seller of used products," 53 *A.L.R.*3d 337 (1973); but in both *Realmuto* and *Turner* the defendants were dealers in, not occasional sellers of, used motor vehicles and therefore subject to strict liability as dealers for injuries sustained from defects in the vehicles.

Interestingly, the California courts, originators of the strict liability doctrine in tort, 63 *Am.Jur.*2d, *Products Liability,* § 1 at 34, n. 12; *Greenman v. Yuba Power Products, Inc.,* 59 *Cal.* 2d 57, 62, 27 *Cal.Rptr.* 697, 700, 377 *P.*2d 897, 900 (Sup.Ct. 1963), refuse to apply strict liability against dealers in used machinery. *E.g., Wilkinson v. Hicks,* 126 *Cal.App.*3d 515, 179 *Cal.Rptr.* 5 (Ct.App.1981) (no liability where operator's hand was crushed by 50-year old press sold by dealer in used machin-

ery); *LaRosa v. Superior Court,* 122 *Cal.App.*3d 741, 176 *Cal.Rptr.* 224 (Ct.App.1981). In *LaRosa,* the employer purchased a used punch press from a dealer in used machinery. An employee was injured by the press and sued the dealer in strict liability. The California Court of Appeals in affirming a summary judgment in favor of the used machinery dealer noted a diversity of opinion, citing two opposing law review notes concerning the liability of dealers in used products: *Sales of Defective Used Products; Should Strict Liability Apply?,* 52 *So.Cal.L.Rev.* 805 (1979) (strict liability should apply); *Protecting the Buyer of Used Products; Is Strict Liability for Commercial Sellers Desirable?,* 33 *Stan.L.Rev.* 535 (1981) (strict liability should not apply). 122 *Cal.App.*3d at 750; 176 *Cal.Rptr.* at 229.

Bliss points out that our Supreme Court in *Michalko v. Cooke Color & Chem. Corp., supra,* stated:

Moreover, we have clearly rejected the requirement that a technical sale occur before strict liability will be imposed ... Thus defendant's argument that strict liability cannot be applied in the absence of a "sale" is unavailing. [91 *N.J.* at 401].

Bliss' reference to the quoted section of *Michalko* is taken out of context. The Supreme Court was analogizing between a lease *vis a vis* a sale and not making a blanket statement that strict liability may be imposed under any circumstances whenever a product is injected into the stream of commerce.

■ The New Jersey Supreme Court has extended the doctrine of strict liability to include leasing, *Cintrone v. Hertz Truck. Leasing & Rental Service,* 45 *N.J.* 434 (1965); *accord, Ettin v. Ava Truck Leasing, Inc.,* 53 *N.J.* 463 (1969), and services, *Newmark v. Gimbel's, Inc.,* 54 *N.J.* 585, 593–595 (1969), but not professional services, *Magrine v. Krasnica,* 94 *N.J.Super.* 228 (Law Div.1967), aff'd *sub nom., Magrine v. Spector,* 100 *N.J.Super.* 223 (App.Div.1968), aff'd 53 *N.J.* 259 (1969); see *Union College v. Kennerly, Slomanson & Smith,* 167 *N.J.Super.* 311, 314 (Law Div.1979); 63 *Am.Jur.*2d, *Products Liability,* §§ 575, 576 at 821–823 (1984); *see* Annotation,

"Products liability: Application of strict liability in tort doctrine to lessor of personal property," 52 *A.L.R.*3d 121 (1973).

The rationale for imposing strict liability on lessors and providers of services is the same as the rationale for imposing strict liability on manufacturers and sellers: (1) the risk of harm from defective services or leased products is great and customers rely on the expertise of the providers of such services or products as much as they rely on the expertise of the providers of products; (2) there is no reason to believe that providers of services or leased products are any less able to spread the costs of accidents than suppliers of products, and (3) imposing strict liability would induce providers of services and leased products to invest in safety, leading to greater protection for their customers and reduce accident cost. *Michalko v. Cooke Color & Chem. Corp., supra,* 91 *N.J.* at 401, n. 4. In *Cintrone v. Hertz Truck. Leasing & Rental Service, supra,* the Supreme Court analogized between leasing, and sales and manufacturing, 45 *N.J.* at 448–452, and concluded that leasing gave rise to a continuing implied promissory warranty that the leased trucks would be fit for the plaintiff-employer's use for the duration of the lease. *Id.* at 452. Further, the nature of the leasing business is such that responsibility of the lessor may be stated in terms of strict liability. *Id.* The same rationale may be applied to bailors. 63 *Am.Jur.*2d, *supra* at § 576.

There have been other applications of the doctrine of strict liability to situations not technically involving the sale of a "product." 63 *Am.Jur.*2d, *supra,* § 573 at 818. In addition to services, except professional services, the doctrine of strict liability has been applied to transactions involving sales of real estate by builders. *E.g., Schipper v. Levitt & Sons, Inc.,* 44 *N.J.* 70 (1965) (installation of a defective hot water system by builder); *Patitucci v. Drelich,* 153 *N.J.Super.* 177 (Law Div. 1977) (sale of four-bedroom home with septic tank sewerage system adequate for only three-bedroom home); *Hermes v. Staiano,* 181 *N.J.Super.* 424 (Law Div.1981) (builder liable to

second owner for defective sewerage system and crack and buckling foundation). See also 63 *Am.Jur.*2d, *supra,* § 191 at 178–179.

There is some authority that the test for the application of the doctrine of strict liability is not whether there was a sale, but rather whether the product was merely placed in a stream of commerce. *Id.* at 179, citing *Link v. Sun Oil Co.,* 160 *Ind.App.* 310, 312 *N.E.*2d 126 (Ct.App.1974). *See also Delaney v. Towmotor Corp.,* 339 *F.*2d 4 (2 Cir.1964) (employee injured when overhead guard on fork lift truck which was delivered for demonstration and try-out purposes collapsed); *Perfection Paint & Color Co. v. Konduris,* 147 *Ind.App.* 106, 258 *N.E.*2d 681 (App.Ct.1970) (seller may be strictly liable for death of employee when lacquer reducer furnished gratuitously to employer was ignited by a hot water heater). The statement in *Link v. Sun Oil Co., supra,* was *dictum* inasmuch as the Court of Appeals of Indiana affirmed a judgment on a verdict for defendant.

On the other hand, there is considerable authority for the proposition that when a product is sold on an occasion or incidental to the business of the seller, the transaction does not come within the purview of the doctrine of strict liability. In support of this position, Western Electric refers to the cases of *Bailey v. ITT Grinnell Corp.,* 536 *F.Supp.* 84 (N.D.Ohio 1982); *Bevard v. Ajax Mfg. Co.,* 473 *F.Supp.* 35 (E.D.Mich.1979); *Bruce v. Martin-Marietta Corp.,* 544 *F.*2d 442 (10th Cir.1976); *McKenna v. Art Pearl Works, Inc.,* 225 *Pa.Super.* 362, 310 *A.* 2d 677 (Pa.Super.1973), and *Balido v. Improved Machinery, Inc.,* 29 *Cal.App.*3d 633, 639, 105 *Cal.Rptr.* 890 (Ct.App.1972). See Annotation, "When is person 'engaged in the business' for purposes of doctrine of strict tort liability," 99 *A.L.R.*3d 671 (1980).

In *Balido v. Improved Machinery, Inc., supra,* one of the defendants purchased a molding press from a manufacturer and, after five years, sold it to plaintiff's employer. Plaintiff

was injured while operating the press. In rejecting plaintiff's contention that the intermediate owner was strictly liable and holding that it was merely a one-time "occasional seller" the California Court of Appeals stated

> [t]here was nothing to suggest that Paper Mate [intermediate seller] was a conduit for the production or distribution of Improved's presses. Paper Mate was no more than a one-time "occasional seller" who does not become subject to strict liability for manufacturing or design defects. [*Id.* at 639–40, 105 *Cal. Rptr.* at 895].

In *McKenna v. Art Pearl Works, Inc., supra,* the Pennsylvania Superior Court affirmed a summary judgment in favor of the defendant, a button manufacturer, who made a single sale of a punch press to another button manufacturer. The court held that the seller was not in the business of selling punch presses and therefore was not strictly liable under § 402A of the *Restatement* to an employee of the purchaser of the press who was injured while operating the press.

In *Bevard v. Ajax Mfg. Co., supra,* an intermediate owner purchased a press and, after using it for several years in its own business, sold it to plaintiff's employer. Plaintiff was injured as a result of the operation of the press and sued the intermediate owner and seller for breach of warranty, products liability and negligence. The United States District Court recognized that, although not adopted by Michigan, the *Restatement, supra,* § 402A carried considerable weight in applying the most current and progressive statement of the law. The District Court held that the intermediate seller was only an occasional seller: "It is not a manufacturer, dealer, wholesaler or retailer. It is not even in the business of reselling used presses. Rather, Altomil [intermediate seller] simply had an old press, and sold it."

In *Bailey v. ITT Grinnell Corp., supra,* plaintiff injured his left hand while operating a punch press. He asserted a claim against ITT on strict liability. ITT purchased the punch press in 1954 for use in its manufacturing business and sold it in 1973 to plaintiff's employer through a machine broker. ITT moved

for summary judgment on the grounds that it was not the designer, manufacturer, assembler, marketer, rebuilder, etc. of punch presses. In granting ITT's motion for summary judgment, the court applied § 402A and Comment *f* of the *Restatement, Torts,* 2d and concluded: "ITT is not a seller engaged in the business of selling punch presses as that status is construed under § 402A ... [A]t most, ITT is an 'occasional seller' of its used machines." *Id.* at 89.

The only New Jersey case on point is *Allen v. Nicole, Inc.,* 172 *N.J.Super.* 442 (Law Div.1980). There the operator of a "pony cart" amusement ride purchased it from a manufacturer and used it for two months. He then sold it to another amusement ride operator. Plaintiff was injured as a result of a ride on the pony cart and sued the owner-operator. In granting the defendant former owner-operator's motion for summary judgment dismissing the strict liability claim, Judge Neustadter stated:

> *Restatement Torts,* § 402(a), first requires that the seller be engaged in the business of selling such a product. This section was drafted to include those "sellers" for whom the disposal of an item into the stream of commerce is a meaningful part of their business pursuit, a status which Dean Prosser characterizes as "supplier." *Prosser, Handbook on the Law of Torts* (4 ed. 1971), at 669. In the case at bar defendant Jones, if he may be viewed as a seller, is even more a consumer of the equipment, *for it is not the sale but the use of the equipment which constitutes his business. His disposal of less favored rides does not rise to the level of being a business of selling.* [*Id.* at 445; emphasis supplied].

Bliss contends that Western Electric's extensive involvement in the design of the safety device and other components for the punch press as a part of its manufacture of communications equipment in fact establishes it as a designer in its own right, particularly since it has its own division which routinely designs and prepares specifications for its specialized equipment. This, Bliss argues, may be considered an integral part of Western Electric's business of manufacturing and selling communications equipment which it routinely sells as unneeded used equipment and placing it into the stream of commerce.

Initially, plaintiff adopts Bliss' arguments. As to plaintiff, his expert's oral report concerning the design defect of the punch press' safety device is confusing. Plaintiff's grievance is not that the guarding device is defective, but rather that there was no guarding device on the punch press in the first place. Any defect in design of the safety device as stated by plaintiff's expert is totally irrelevant since, among other things, the expert originally found a design defect because "[t]he point of operation region was unguarded" and "[g]uards could have been fixed about the point of operation." Inasmuch as the safety device designed by Western Electric was completely removed from the punch press, any design defect as contended by plaintiff's expert is inapposite. The core of plaintiff's contention, the lack of the guarding device, is the very reason that Western Electric designed the safety guard for its own specialized use, but not for consumers.

As to Bliss, it admits that it does not supply the point of operation guarding on general presses because the type of guarding and dimensions will vary in accordance with the use of the press. This makes sense, but even so, Bliss, as a manufacturer, may still have a duty to a user regardless of whether it was the custom of the trade for the ultimate purchaser to install the safety devices. *Michalko v. Cooke Color & Chem. Corp.*, *supra*, 91 *N.J.* at 397; *Bexiga v. Havir Manufacturing Corp.*, 60 *N.J.* 402, 406–411 (1972).

█ Western Electric is not primarily engaged in the business of designing safety guards for punch presses. Since Bliss does not provide the safety guards, it was incumbent upon Western Electric to design its own safety guards to be applied in accordance with the purpose and use for which the particular punch press was to be adapted. Western Electric was a consumer of the punch press and did not design the safety devices for public use but solely for its own use. This does not establish Western Electric as a designer of safety equipment

for punch presses to be placed in the stream of commerce for consumers or other users.

Comment *f.* of the *Restatement, supra,* § 402A illustrates an occasional sale as an instance when a housewife, on one occasion, sells a jar of jam to her neighbor, or a private owner of an automobile trades it to a dealer. Under such circumstances there would be no liability except for negligence in the sale of a product when the seller knew or had reason to know of the danger. See also, *Prosser and Keeton, The Law of Torts* (5 ed. 1984), § 100 at 705. Bliss asserts that the sale of a used press by Western Electric is by no means comparable to a housewife selling a jar of jam. By comparison, the sale of a used punch press by an international electronic manufacturing corporation such as Western Electric may be the equivalent to a housewife selling a jar of jam to a neighbor.

We have previously noted that the underlying premise of the doctrine of strict liability is that one engaged in the business of selling a product impliedly represents that the goods which are placed into the stream of commerce are free from defect. *Suter, supra,* 81 *N.J.* at 169. Not only manufacturers, but "... all subsequent parties in the chain of distribution, are strictly liable for damages caused by defectively designed products." *Michalko v. Cooke Color & Chem. Corp., supra,* 91 *N.J.* at 394. Western Electric was not a party in the chain of distribution, but rather a consumer who sold the punch press after it reached the end of its useful economic life, insofar as Western Electric was concerned.

When a manufacturer, distributor, supplier or retailer engages in placing a product into the stream of commerce it benefits directly from the profits derived through a sale of the product. At the same time the enterprise engaged in that activity purposely exposes itself to the risk directly connected and identified with the product. Any benefit from the sale of a discarded punch press, such as by Western Electric in the present case, is only incidental and collateral to its business.

 It is only those businesses that "... become a part of the overall producing and marketing enterprise [for a particular product] that should bear the costs of injuries resulting from defective products." *Newmark v. Gimbel's, Inc., supra,* 54 *N.J.* at 600. A dealer of a product may put pressure on the manufacturer to make the product safe and has an indemnity action against the manufacturer who must bear the primary responsibility for putting defective products into the stream of trade. *Id.* Where a manufacturer has control over the inspection and quality of the product, it retains the ability to manufacture the product reasonably fit, usable and safe for its intended purpose. An enterprise engaged in the chain of distribution can also spread the expense of a defective product by an increase in the cost of the product or the increase in the cost of insurance due to the defective product. An occasional seller does not have the opportunity to recapture any loss from subsequent sales of the product for injury resulting from an occasional sale of a defective product.

 Central to the products liability doctrine is the thesis that "only safe products should be marketed—a safe product being one whose utility outweighs its inherent risk. provided that risk has been reduced to the greatest extent possible consistent with the product's continued utility." *Soler v. Castmaster, Div. of H.P.M. Corp., supra,* 98 *N.J.* at 145, quoting *Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229, 238 n. 1 (1981). We have seen that in a design defect case, plaintiff must show that the product "is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes." *Michalko v. Cooke Color & Chem. Corp., supra,* 91 *N.J.* at 394, citing *Suter,* 81 *N.J.* at 169.

In discarding this 23-year-old punch press, expendable for the purposes of Western Electric, it obviously is no longer reasonably fit or suitable for its original intended purpose. It evidently satisfied its original purpose but in discarding the press, the "intended or reasonably foreseeable purposes" are not readily

determinable. It was sold to a used equipment dealer. The press may have been sold for junk or scrap or dismantled and salvaged for used parts. The press component may have been converted to, or used for, some other purpose, or, as it actually developed, continued to be used as a punch press in an altered form.

The determination of whether strict liability applies is made by balancing the magnitude of the risks created by its dangerous conditions against the social utility attained by putting the product on the market. *Michalko*, 91 *N.J.* at 394, citing *Beshada v. Johns-Manville Corp.*, 90 *N.J.* 191, 199–200 (1982). Strict liability attaches if the product's utility is outweighed by the magnitude of the risk involved in its use. *Michalko, Id.*, citing *Freund*, 87 *N.J.* at 238 n. 1. When a 23-year-old punch press, which a consumer determines has outlived its original purpose, is discarded, there is no "magnitude of the risk involved in its use" against which its utility may be weighed; insofar as the consumer is concerned, the product has no further use.

The position of the *Restatement, Torts* 2d, § 402A(1), that the doctrine of strict liability is limited to one who is engaged in the business of selling a product, finds support in *Prosser and Keeton, supra*, § 100 at 705.

Only a seller who can be regarded as a merchant or one engaged in the business of supplying goods of the kind involved in the case is subject to strict liability, either on warranty or in tort.

Dean Prosser, in his article "The Fall of the Citadel (strict liability to the Consumer)," 50 *Minn.L.Rev.* 791, 814 (1966), projected:

In all of the cases in which strict liability has been accepted and applied, the defendant has been engaged in the business of supplying goods of the particular kind. So far as can be discovered, the question has not even arisen as to whether the rule might apply to one who is not so engaged. *One may predict with some assurance that it will not.* [emphasis supplied].

We hold that the disposal of a product such as, in this case, a punch press, by a consumer after 23 years of use, does

not constitute the consumer as being in the "business of selling" as a manufacturer, seller, distributor, retailer or supplier subject to strict liability pursuant to *Restatement, supra,* § 402A(1). Rather, such a seller of a second-hand product is merely an "occasional seller" of an isolated sale of discarded equipment and not engaged in the activity of selling the product as part of its business. *See Restatement, supra,* Comment *f.* at 350. As such, there is no responsibility under the doctrine of strict liability.

Lastly, plaintiff has admitted, and there are no facts to support an action based on any negligence of Western Electric.

Affirmed.