Albert WEBER and Jean Weber, Plaintiffs,

v.

JOHNS–MANVILLE CORPORATION, et al., Defendants.

Theodore PENNEY, et al., Plaintiffs,

v.

JOHNS–MANVILLE CORPORATION, et al., Defendants.

Frank SMIGELSKI, et al., Plaintiffs,

v.

CAREY CANADIAN MINES, et al., Defendants.

Austin WINNICKI, et al., Plaintiffs,

v.

CAREY CANADIAN MINES, et al., Defendants.

Thomas LENAHAN, Plaintiff,

v.

CAREY CANADIAN MINES, et al., Defendants.

Civ. A. Nos. 82–1914, 82–3131, 84–1558, 85–4979 and 84–633.

United States District Court, D. New Jersey.

March 13, 1986.

Nathan A. Friedman, P.A. by Michael S. Berger, Cherry Hill, N.J., for plaintiffs.

Enright, Lenney & McGrath by Michael P. McGrath, Alan G. Swetz, Bloomfield, N.J., for defendant Pacor.

McCarter & English by Andrew T. Berry, Michael A. Tanenbaum, Newark, N.J., for defendants Eagle-Picher, Carey Canada, Celotex, Keene, Owens-Illinois, Armstrong and Pittsburgh-Corning.

OPINION

CLARKSON S. FISHER, Chief Judge.

In these asbestos-related product-liability actions Pacor, Inc., one of many co-defendants, moves for summary judgment dismissing all claims and cross claims against it. Pacor proceeds on the theory that it functioned as nothing more than a "mere broker" in the distribution of certain asbes-

tos products to which plaintiffs allegedly were exposed. Therefore, according to Pacor, it was not a link in the marketing and liability chain forged among other defendants more directly connected with the defective product. The motion is opposed by plaintiffs and several of the co-defendants.[1] Plaintiffs have cross-moved for determination as a matter of law that Pacor is a link in the chain of distribution potentially liable to plaintiffs. For the reasons which follow, Pacor's motion is denied and plaintiffs' motion is granted.

Pacor's motion appears to offer a legal theory innovative in New Jersey. State law, which governs these diversity actions, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), clearly holds that for a cause of action in strict liability to be proved, a plaintiff "must establish [1] that the product was defective, [2] that the defect arose while in the control of the defendant, and [3] that the plaintiff suffered injury thereby." *Scanlon v. General Motors Corp.*, 65 N.J. 582, 590, 326 A.2d 673 (1974). Pacor focuses on the second of these three elements, arguing that it never exercised the requisite control or possession over the "defective" products in question because it acted "solely as a broker" in the relevant transactions that resulted in the supplying of asbestos materials to which plaintiffs were exposed. In effect, Pacor should obtain judgment as a matter of New Jersey law since it never handled the asbestos products but acted merely as "the voice over the phone" that placed Buyer X's order with Seller Y.

The defense thus raised by Pacor seems innovative, as mentioned above, because as far as the court can determine, no New Jersey court has expressly addressed the narrow question whether "mere brokers" are outside the chain of culpable marketers-distributors of defective products. There is certainly sweeping language in the reported decisions for the proposition that "[u]nder New Jersey law, manufacturers, as well as *all subsequent parties in the chain of distribution*, are strictly liable for damages caused by defectively designed products." *Michalko v. Cooke Color & Chemical Corp.*, 91 N.J. 386, 394, 451 A.2d 179 (1982) (emphasis added). Yet these broad terms do not squarely hold that brokers are within the chain. Thus, as a federal court sitting in diversity, we are called upon to predict[2] what a New Jersey court would do if confronted with the two critical issues presented here, namely, whether self-styled mere brokers may be held strictly liable in tort and, perhaps more fundamentally, whether Pacor is in fact a "mere broker."

Some factual background is useful at this point. The actions are brought by employees who were exposed to raw asbestos and asbestos-containing insulation products at the Union Carbide Corporation in Bound Brook, New Jersey. The exposure occurred at various times between 1946 and 1980. Carbide records indicate that between 1960 and 1972 Pacor participated as an intermediary of some sort in Carbide's purchase of approximately 3.5 million pounds of raw asbestos products from Canadian Johns-Manville. Pacor acknowledges this fact (see Reply Brief of Defendant Pacor, Inc., in Support of Motion (Reply Brief) at 6–7) but adds, somewhat extraneously, that Carbide's total asbestos purchases during relevant times amounted to 43.5 million pounds. Of that amount, 5.8 million pounds were purchased *directly* from Johns-Manville during the years 1951 through 1960 before Pacor entered the picture. *Id.* Pacor further asserts that its business involved principally the installation of asbestos pipecovering in the Philadelphia area and normally did not encompass sales of asbestos fibers. Affidavit of

---

1. The co-defendants opposing the motion include Eagle-Picher Industries, Carey Canada, Celotex Corporation, Keene Corporation, Owens-Illinois, Armstrong World Industries, and Pittsburgh-Corning Corporation.

2. *Becker v. Interstate Properties*, 569 F.2d 1203, 1206 (3d Cir.1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978) (the federal tribunal is obligated to follow the course that it expects the state courts would adopt in similar circumstances).

James E. Sullivan, Chairman of the Board of Pacor, Inc. (Sullivan Affidavit). "At the request of Johns-Manville, Pacor acted as a broker for sales of asbestos fiber from Johns-Manville's mines to Union Carbide" but Pacor "never delivered any asbestos fiber or products to Union Carbide." *Id.* Thus, the argument goes, the Pacor-brokered sales to Carbide were isolated and infrequent events, unique both to the nature of movant's customary business and to the geographic scope of its operations. "Pacor's only involvement in the transaction was to receive orders which were forwarded to the miner, to send invoices and to insure the forwarding of the proper funds." Reply Brief at 10.

The court takes note of answers to interrogatories 3, 31, and 80, indicating that Pacor, and its predecessor Philadelphia Asbestos Corporation, has been an insulation contractor, distributor, and fabricator for over 60 years, a member of the Asbestos Textile Institute (1949–50), and a manufacturer of asbestos-containing textiles (1942–50). Exhibit A to Plaintiffs' Brief in Support of Cross-Motion for Summary Judgment as to Defendant Pacor, Inc. and in Opposition to Defendant Pacor, Inc.'s Motion for Summary Judgment.[3]

Although the parties are not in complete agreement as to the significance and characterization of some of these facts, there is no genuine dispute as to the underlying substance. Therefore, summary judgment is appropriate.

The threshold problem is to define the term "broker."[4] The parties have provided the court with no authority on this point and my research has disclosed nothing of relevance in the New Jersey cases. The

question arose in this court, however, in *Martins Ferreira v. Jayess Corp.*, 214 F.Supp. 723 (D.N.J.1963). There Judge Wortendyke wrote that a broker is "one whose duty is to bring parties together and he is, in effect, a go-between whose responsibility it is to effect agreement between the parties." *Id.* at 727. See also *Thomas v. Commissioner of Internal Revenue*, 254 F.2d 233, 236 (5th Cir.1958). The court turned for further guidance to Justice Story's treatise on agency.

The true definition of a broker seems to be that he is an agent, employed to make bargains and contracts between other persons in matters of trade, commerce, or navigation.... Properly speaking, a broker is a mere negotiator between the other parties, and he never acts in his own name, but in the names of those, who employ him: ... He is strictly therefore, a middle man, or intermediate negotiator between the parties.

J. Story, Agency § 28 (1846).

Movant obviously fits this broad description. It is evident from the Sullivan Affidavit that Pacor was invited to handle a transaction and accepted willingly. It is undisputed that the deliveries of asbestos fiber were made directly from Johns-Manville to Carbide. There is nothing to indicate that the asbestos in question passed through Pacor's hands at any time. The inference then is that Pacor was indeed a broker in the Manville-Carbide relationship.

By the same standards, however, Pacor was not an *ordinary* broker or, to use Story's words, "*strictly* a middleman." Although movant may indeed have rendered a largely ministerial service, the record in-

---

**3.** The following excerpt from Pacor's answer to interrogatory 3 is especially significant:

Pacor, Inc. is an insulation contractor, distributor and fabricator. Pacor, Inc. has sold, but not manufactured certain asbestos and asbestos bearing products since 1921. In 1972 and 1973, asbestos was eliminated from industrial insulation products.

. . . .

Pacor, Inc. has sold and distributed asbestos bearing materials for a number of various concerns and has sold asbestos products to numerous customers since 1921. Pacor, Inc.

distributed industrial insulation products to the Sinclair Oil Company, a predecessor of B.P. Oil Company....

**4.** Nevertheless, the court must be wary of overemphasizing semantics. Labels such as "wholesaler," "retailer," and "distributer" have an important and inescapable role in the case law relevant to the identification of culpable links in the product-liability chain. The chain analogy, however, is but a tool and the court must consider substance over form.

dicates that Pacor was more than a blind order-taker. Pacor was intimately involved in the asbestos industry for a number of years as contractor, distributor, and fabricator. Its familiarity with the hazards and norms of the industry is evidenced by its practice of requiring employees working in areas of excessive dust concentration to wear protective devices and respirators. (Answer to Interrogatory 105, Exhibit A to Co-defendants' Brief.) Pacor was not an unsophisticated plyer of the trade nor were the amounts of asbestos which reached Carbide by virtue of its efforts insignificant. Additionally, although Pacor's brokerage service was an isolated and limited feature of its overall business, the brokered transactions were by no means isolated or occasional but occurred in ten of the thirteen years, culminating in 1972.

Against this background it would be a misconstruction of the record to characterize Pacor as a "mere broker"; perhaps "broker plus" would be more apropos. In any event, because the mere broker label does not apply, Pacor's motion premised on that notion need not be addressed further and will be denied.

■ There remains the related but different question put by plaintiffs' cross-motion: an affirmative determination whether Pacor, regardless of the broker phraseology, was a link in the distribution chain as a matter of law. Since this much narrower issue does not hinge on the broker label, it is not resolved entirely by the foregoing discussion.

As noted above and correctly asserted by Pacor, the second element of New Jersey's three-part strict-liability standard calls for proof that the particular defect arose while the product was "in the control of the defendant." *Scanlon*, 65 N.J. at 590, 326 A.2d 673. Contrary to Pacor's view, this court does not read that language to impose an absolute "hands on" requirement. For in the course of applying the control element, New Jersey courts routinely have also employed the "stream of commerce" rationale to find liability, and done so without doctrinal difficulty.[5] Additionally, the New Jersey Supreme Court has clearly rejected the requirement that a technical sale occur before strict liability will be imposed. See *Cintrone v. Hertz Truck Leasing & Rental Service*, 45 N.J. 434, 452, 212 A.2d 769 (1965) (liability imposed even though product was leased rather than sold). Consequently, "control" as used in the *Scanlon* formula cannot be read so narrowly as to immunize defendants who have managed to avoid actual contact with the defective product but must be understood more broadly to permit a finding of liability where the totality of facts indicates a sufficient causative relationship or connection between defendant and product. Here, such a connection is clear from the undisputed fact that Pacor—whether considered a seller, distributor, or a provider of services—arranged and profited from the supply of millions of pounds of raw asbestos packaged in its original and unchanged condition.[6]

---

5. See *Suter v. San Angelo Foundry & Machine Co.*, 81 N.J. 150, 169–70, 406 A.2d 140 (1979) ("Historically the doctrine's underlying premise is that one engaged in the business of selling a product impliedly represents that goods which it places in the stream of commerce are free of defects.... It is not necessary to show that defendant created the defect. What is important is that the defect did in fact exist when the product was distributed by and was under the control of defendant."); *American White Cross v. Continental Insurance Company*, 202 N.J.Super. 372, 378–79, 495 A.2d 152 (App.Div.1985) ("When a manufacturer produces a product which contains a defect in design or one caused by faulty workmanship and it is sold to a distributor who in turn sells it to a retailer, the latter two links in the chain to the ultimate consumer are merely conduits in the stream of commerce.... Nevertheless, each, in that role, is strictly liable to the injured ultimate user.")

6. In this regard, the court in *Santiago v. E.W. Bliss Division*, 201 N.J.Super. 205, 223, 492 A.2d 1089 (App.Div.1985), stated that

> [w]hen a manufacturer, distributor, supplier or retailer engages in placing a product into the stream of commerce it benefits directly from the profits derived through a sale of the product. At the same time the enterprise engaged in that activity purposely exposes itself to the risk directly connected and identified with the product.

Pacor has caused itself to "become part of the overall producing and marketing enterprise." *Newmark v. Gimbel's Inc.,* 54 N.J. 585, 600, 258 A.2d 297 (1969). Its connection with the asbestos products, remote though it may be in comparison with that of the other links in the chain, is a factual reality and a factual consideration that should be left for a jury to weigh in the course of assessing, and perhaps commensurately reducing, Pacor's ultimate responsibility.[7]

The result here might be different were the alleged defect attributed to some post-manufacture mishandling, such as in the exploding bottle cases. In such a context, the materiality of actual "hands on" control is obviously substantially greater and the identity of all intermediate handlers is a far more critical factor. The same does not hold true, though, in a failure-to-warn case such as this where the manufacturer's original product was entirely unaltered by subsequent distributors.

For the foregoing reasons, Pacor's motion for summary judgment is denied and plaintiffs' motion is granted. Plaintiffs will submit an order. No costs.

Max Zelden, New Orleans, La., for plaintiff.

Lawrence J. Duplass, New Orleans, La., for defendant.

---

7. See *Menacho v. Adamson United Co.,* 420 F.Supp. 128, 139 (D.N.J.1976) (liability imposed for a defect should be commensurate with the degree of product control).